CAMDEN PLAZA PARKING, INC., A NEW JERSEY CORPO-
RATION, PLAINTIFF-APPELLANT, v. CITY OF CAMDEN,
A MUNICIPAL CORPORATION OF THE STATE OF NEW
JERSEY, DEFENDANT-RESPONDENT.

WILLIAM H. HEISER AND MARY C. HEISER, PLAINTIFFS-
APPELLANTS, v. CITY OF CAMDEN, A MUNICIPAL COR-
PORATION OF THE STATE OF NEW JERSEY; NEDMAC
ASSOCIATES, INC., A CORPORATION; AND CAMDEN
PLAZA PARKING, INC., A NEW JERSEY CORPORATION,
DEFENDANTS-RESPONDENTS.

Argued June 28, 1954—Decided June 28, 1954.

*Mr. John R. DiMona* argued the cause for appellant and defendant-respondent Camden Plaza Parking, Inc. (*Mr. Irvin M. Lichtenstein* on the brief).

*Mr. A. Millard Taylor* argued the cause for appellants Heiser (*Messrs. Carroll, Taylor & Bischoff*, attorneys).

*Mr. Norman Heine* argued the cause for respondent City of Camden (*Mr. Joseph Cowgill*, of counsel).

*Mr. Joseph W. Cowgill* argued the cause for respondent Nedmac Associates, Inc. (*Mr. C. Zachary Seltzer*, of counsel).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   The Camden Central Business District is in immediate need of additional off-street parking facilities and that need will be substantially greater in the near future when a proposed new department store is erected on the Old Court House site close by the City Hall Plaza, a municipally-owned area designated "Roosevelt Plaza" by resolution of the municipal governing body adopted October 29, 1936.

A Traffic and Parking Study of the Central District, prepared in December 1953 for the City of Camden by firms of architect-engineers and management consultants, showed that the then existing deficiency in the area of 250 spaces of off-street parking facilities would be increased to 1,250 spaces upon the opening of the new department store.   The study

pointed out that City Hall Plaza is now utilized in part at least as an open-air off-street parking lot, part operated by the city itself as a metered parking lot and part by a private parking lot operator under lease from the city. The study recommended that the City Hall plaza parking lots be utilized for the construction of a multi-story parkade with a capacity for 1,400 vehicles, thus providing the 250 spaces now lacking in the area, the 175 presently provided by the parking lots on the Plaza, and the 1,000 additional spaces estimated to be needed when the new department store is built. Suggested design and type of construction and sketches of such a parkade were included with the study.

Shortly thereafter, in March 1954, the City of Camden entered into a written agreement with the interests about to construct the department store "to take the necessary steps to construct or procure the construction * * * of a multi-storied structure * * * for off-street parking * * * that will accommodate approximately one thousand (1000) automobiles, which structure shall be substantially similar in design and construction to that shown upon the December, 1953 study * * *."

Not desiring to finance the construction cost, the city evolved a plan for selling a 50-year leasehold in the city-owned land to the highest responsible bidder who would undertake the construction of the multi-story structure at its own expense, title upon completion, however, to vest in the city, subject only to the leasehold. A resolution was adopted by the governing body on March 11, 1954, directing the advertising of the sale and setting forth the terms of bidding. Two bids were received and opened on the sale date, April 20, 1954. One bid was that of Nedmac Associates, Inc., and the other that of Camden Plaza Parking, Inc. The bid of Nedmac Associates, Inc., was accepted by resolution adopted April 22, 1954.

Camden Plaza Parking, Inc., the unsuccessful bidder, promptly filed an action in lieu of prerogative writ against the city asking a judgment setting aside the award to Nedmac

154

Associates, Inc., and an order directing the city to accept its bid. The city moved for and was allowed a summary judgment in its favor, which was entered May 6, 1954. We certified of our own motion the appeal therefrom of Camden Plaza Parking, Inc.

Thereafter, on May 20, 1954, a taxpayers' action in lieu of prerogative writ was brought by William H. and Mary C. Heiser against the City of Camden, Nedmac Associates, Inc., and Camden Plaza Parking, Inc. Included in the relief sought is "that the action taken by the City of Camden in connection with the passage of the Resolution, the advertisement and the award of the bid to Nedmac Associates, Inc., be declared illegal and void." The Heisers moved for and on June 16, 1954 were denied a temporary restraint pending trial staying the taking of "any proceedings or steps whatsoever under or by virtue of the Resolution of the City of Camden adopted April 22, 1954." We of our own motion certified the appeal of the Heisers from that order.

The appeals were orally argued on June 28, 1954, after which we directed the setting aside of the summary judgment and, to the extent that it denied the temporary restraint, of the order of June 16, 1954, and directed the remand of the consolidated action with direction to enter judgment vacating and setting aside the resolutions adopted by the city on March 11, 1954 and April 22, 1954, and declaring illegal and void all proceedings and actions taken thereunder. We also announced that this opinion would be prepared and filed in due course. *Cf. Schlossberg v. Jersey City Sewerage Authority,* 15 *N. J.* 360 (1954); *Stevenson v. Gilfert,* 13 *N. J.* 496 (1953).

■ Action by a municipality to relieve traffic congestion through the establishment of off-street public parking facilities is the exercise of a public and essential governmental function, and publicly-owned lands used for such purposes are devoted to a public use. The parking crisis in the modern day threatens the very welfare of the community, and statutes and court decisions recognize that public lands employed by

public bodies for public off-street parking are devoted to a public purpose, *R. S.* 40:60–25.1, *R. S.* 40:56–1.1, *R. S.* 40:11A–1; *DeLorenzo v. City of Hackensack*, 9 *N. J.* 379 (1952). "It is only in recent years that the matter of the provision or operation of such off-street parking facilities by municipal corporations has attained such prominence" and "One important question met with rather generally in the cases on the present subject is that as to whether the provision of off-street parking facilities by a municipality is a 'public purpose,' 'public use,' 'municipal purpose' or the like, as distinguished from a private purpose or use. * * *. * * * the greater amount of the authority—particularly that found in the later cases—supports the view that the provision by a municipal corporation of off-street parking facilities for use by the general public is a public or municipal purpose as distinguished from a private one, at least when the primary object of the parking project is to alleviate traffic congestion and thereby promote the usability of the municipal streets for the movement of traffic." *Annot., Municipal Off-street Parking*, 8 *A. L. R.* 2d, 374, 375, 376; see also *McSorley v. Fitzgerald*, 359 *Pa.* 264, 59 *A.* 2d 142, 143 (*Sup. Ct. Pa.* 1948). And the land and facility do not cease to be used for a public purpose when leased to private operators for operation as a public parking facility. See *Public Parking Authority &c. v. Board of Property Assessment*, 377 *Pa.* 274, 105 *A.* 2d 165 (*Sup. Ct. Pa.* 1954). The public character of the use in the instant case is expressly recognized in the municipal resolution of March 11, 1954 which contains findings that the development of the city-owned tract as an off-street parking facility in the mode proposed in the resolution is necessary "in order to promote the public safety, convenience and welfare and in the best interest of the public."

▮ But municipalities have only such powers as are given them by the Legislature and in authorizing municipalities to provide public off-street parking facilities the Legislature has not seen fit to authorize the leasing of mu-

nicipal land to a private person to construct and operate a public parking facility thereon. There is legislation which permits a municipality itself to operate off-street parking facilities and to charge parking fees, *R. S.* 40:60–25.1 (*L.* 1942, *p.* 427). And under *R. S.* 40:56–1.1, *L.* 1949, *c.* 261, *p.* 828, a municipality may undertake, as a local improvement, the work of providing facilities for the parking of motor vehicles by the acquisition, by purchase or lease, and improvement of real property and by the construction of buildings and structures. But the only statutory authority whereby municipally-owned lands may be leased to private persons to construct and operate a public off-street parking facility is that which is given a parking authority created under the Parking Authority Law of 1948, *L.* 1948, *c.* 198, *p.* 975, *R. S.* 40:11A–6(*b*), (*c*), (*e*). The plan under consideration here, however, does not involve a parking authority; the City of Camden has not created a parking authority under that law. We note that *section* 40:11A–23 of the Parking Authority Law expressly authorizes "any public body * * * upon such terms, with or without consideration, as it may determine" to "(a) * * * Dedicate, sell, convey, or lease any of its property to a parking authority" and that under *section* 40:11A–18 an authority is empowered "to take over or lease, or manage, any parking project or undertaking constructed or owned by any county or municipality."

A lease arrangement substantially like that involved here was sustained by the Supreme Judicial Court of Massachusetts in *Lowell v. City of Boston,* 322 *Mass.* 709, 79 *N. E.* 2d 713 (1948), appeal denied in *Pierce v. City of Boston,* 335 *U. S.* 849, 69 *S. Ct.* 84, 93 *L. Ed.* 398 (1948),—but under a statute which expressly authorized the City of Boston to lease to a private corporation a portion of the subsurface of Boston Common and the Public Garden to be used as a site for an underground parking garage for use by the public. The court found that Boston did not, as claimed by objectors, originally take the land under any trust which prevented the

expressly authorized lease, and that, although Boston after acquiring the land had dedicated the land to public use as a common, the Legislature, representing the general public, could properly authorize the city to vary the public use. And in *Blank v. Browne*, 217 *App. Div.* 624, 216 *N. Y. S.* 664 (1926), the right of parking authorities to lease to a private individual, for operation as a parking place, a certain municipal park in Coney Island was sustained but only because the court was able to find distinctive circumstances, namely, that such use could properly be deemed an incidental use of an adjacent greater park much patronized by the public. Neither decision is a helpful precedent upon the case made in the record before us.

The city argues that statutory authority for the proposed lease is to be found in *R. S.* 40:60–42 providing that "Every municipality may lease for fixed and limited terms to any person any land or building of the municipality *not presently needed for public use*" (italics added), or, Camden being a city of the second class of this state, in *R. S.* 40:176–12 providing that "Every city of the second class of this state may lease to any person, partnership, corporation or association any land or building of the municipality *not needed for public use* (italics added) for a fixed term not exceeding fifty (50) years." But, as is said above, the construction and operation of the proposed public-owned parking facility upon the publicly owned tract constitutes the use of the land a public use even though the facility is privately constructed and operated under lease from the city. These statutes are therefore inapplicable since the tract does not satisfy the description of land "not presently needed for public use" or "not needed for public use."

The city contends that City Hall Plaza is not held presently in a governmental capacity but in a proprietary function and, citing *Southeastern Greyhound Lines, Inc., v. City of Lexington*, 299 *Ky.* 510, 186 *S. W. 2d* 201 (*Ct. of App. of Ky.* 1945), argues that, like property purchased or condemned for a public purpose, but which has not been dedicated to such use,

it therefore may be leased under the cited statutes because not actually in public use. Apart from the fact that the tract, in part at least, is and has for some time been in use as a public off-street parking lot, partially metered and partially operated by a private lessee, and thus has been and is devoted to a public use which the proposed multi-storied structure will merely substantially enlarge, the only municipally-owned lands which may be leased on the authority of *R. S.* 40:60–42 or *R. S.* 40:176–12 are lands "not presently needed for public use" or "not needed for public use." The emphasis is on the need for the land for public use when its leasing is attempted. Here the city's own resolution of March 11, 1954 establishes unequivocally that the land *is* imperatively needed for use as a substantially enlarged public off-street parking facility. Thus the present need of the land for public use is conclusively demonstrated.

The plaintiffs in both suits argued their appeals on the premise that if the proposed leasehold arrangement was within the city's power to make, the award to Nedmac Associates, Inc., must nevertheless be set aside for alleged deficiencies in the invitation for bids. The insistence is that the city could not legally enter into the arrangement without first advertising for bids under *R. S.* 40:50–1 which provides, "No municipality shall enter into any contract for the doing of any work, or for the furnishing of any materials, supplies or labor, or the hiring of teams or vehicles, where the sum to be expended exceeds the sum of one thousand dollars, unless the governing body shall first publicly advertise for bids therefore, and shall award the contract to the lowest [here the highest] responsible bidder." It is charged that the invitation to bid published by the city was not sufficiently precise and definite in respect of the essential elements entering into the competitive scheme as to permit of bidding according to a common standard of competition.

■ The unsuccessful bidder, Camden Plaza Parking, Inc., has no standing to make this attack. *Waszen v. City of Atlantic City,* 1 *N. J.* 272 (1949). But the Heisers, as citi-

zens and taxpayers, may attack the award to Nedmac and also raise the question of the sufficiency of the specifications for bidding. *Waszen v. Atlantic City, supra; Scaluorchio v. Jersey City Incinerator Authority,* 14 *N. J.* 72 (1953). We, in the exercise of our original jurisdiction, *R. R.* 1:5–4, have consolidated the actions, *R. R.* 4:43–1, and treated them as if, as in the *Waszen* case, the unsuccessful bidder and the taxpayers joined as plaintiffs in a single action against the city and the successful bidder.

█ We agree that the vagueness and ambiguities of the terms for bidding set out in the city's advertisement, which largely incorporates the provisions of the resolution of March 11, 1954, particularly as to the form of the bond to be furnished and the specifications of the multi-storied structure called for, and the uncertainty whether the bid form required to be used by bidders called for the offer of a fixed rental only or permitted a bid based upon a percentage of receipts, compel the conclusion that the specifications for bids fall far short of the requirements that such specifications shall be sufficiently full and explicit to notify prospective bidders of the kind and nature of the subject of the contract and set up a common standard of competition, in short, supply such information as will afford all bidders a fair and reasonable opportunity for competition and enable them to bid intelligently. See *McQuillin, Municipal Corporations,* 3d ed., vol. 10, sec. 29.52, p. 308; *Waszen v. City of Atlantic City, supra; Wilmington Parking Authority v. Ranken,* —— Del. ——, 105 *A.* 2d 614 (*Sup. Ct.* 1954).

The city insists, however, that the proposed leasehold is not a contract subject to *R. S.* 40:50–1 so that the city was not obliged to advertise for bids and that the only test is the good faith and honesty of the city's action in the circumstances, citing *Peters Garage v. City of Burlington,* 121 *N. J. L.* 523 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 227 (*E. & A.* 1939); *Ryan v. Paterson,* 66 *N. J. L.* 533 (*Sup. Ct.* 1901). We are of the view that it is reasonable to suppose that the Legislature contemplated that a project of this mag-

nitude would be awarded by way of competitive bidding to the highest responsible bidder. *Cf. A. C. Schultes & Sons v. Haddon Township*, 8 *N. J.* 103 (1951). However, our conclusion that the city has no statutory authority to enter into the leasehold arrangement obviates the necessity of our determining the question in this case.

The taxpayers also argue that the leasehold arrangement contemplates construction of a building subject to *R. S.* 40:9–3, which provides that "In the preparation of plans and specifications for the erection, construction, alteration or repair of any public building by any political subdivision of this state, when the entire cost of the work will exceed one thousand dollars in amount, the architect-engineer or other person preparing the plans and specifications, shall prepare separate plans and specifications for the plumbing and gas fitting, and all kindred work, and of the steam and hot water heating and ventilating apparatus, steam power plants and kindred work, and electrical work, structural steel and ornamental iron work." We question whether construction by the lessee under the proposed arrangement would be "construction * * * by any political subdivision of this state" within that statute. But here, also, our result makes it unnecessary to decide that question.

The consolidated action is remanded to the Law Division with direction to vacate and set aside the summary judgment entered May 6, 1954, and the order of June 16, 1954 to the extent that it denies the temporary restraint, and to enter a final judgment against the City of Camden and Nedmac Associates, Inc., vacating and setting aside the resolutions adopted by the City of Camden on March 11, 1954 and April 22, 1954, and declaring illegal and void all proceedings and actions taken thereunder.

HEHER, J. (dissenting). The basic inquiry here is whether the proposed lease of municipal lands would be *ultra vires* the municipality and void, and this involves the question of whether it would constitute an exercise of power compre-

hended in *R. S.* 40:60–42 and *R. S.* 40:176–12, the latter applicable to second-class cities. The former act empowers all municipalities to lease for "fixed and limited terms" to "any person" any land or building "not presently needed for public use"; and if any portion of a building owned by it is "not presently needed for the use of the municipality," the local governing body may rent such portion for "private purposes" to the person "who will pay the highest rent therefor, for any use not detrimental to such building or the use of the remainder by the municipality." And the latter statute authorizes cities of the second class to lease to "any person" any land and building "not needed for public use" for a fixed term not exceeding 50 years.

The majority holds the view that the "construction and operation of the proposed public owned parking facility upon the publicly owned tract" constitutes the "use of the land" a "public use," even though the facility is "privately constructed and operated under the lease from the city," and so the cited statutes are inapplicable "since the tract does not satisfy the description of land 'not presently needed for public use' or 'not needed for public use.'" And it is deemed significant that the particular plot, "in part at least," has been in use as a "public" off-street parking lot, "partially metered and partially operated by a private lessee," and so devoted to a "public use" which the proposed structure will "merely substantially enlarge," and hence does not meet the asserted statutory test. It is said, in sum, that the "emphasis is on the need for the land for public use when its leasing is attempted," and here the city's "own resolution * * * establishes unequivocally that the land is imperatively needed for use as a substantially enlarged public off-street parking facility," and thus "the present need of the land for public use is conclusively demonstrated."

But these, I submit, are illusory considerations. The city is under no duty whatever to provide off-street parking facilities, either as a governmental or a local proprietary function, under *L.* 1942, *c.* 138, *N. J. S. A.* 40:60–25.1, or

to undertake the construction of such facilities as a local improvement under *L*. 1949, *c*. 261, *N. J. S. A*. 40:56–1.1, or to organize an authority under the Parking Authority Law, *L*. 1948, *c*. 198, *N. J. S. A*. 40:11A–1, *et seq.*, as the only statutory mode by which municipally-owned lands "may be leased to private persons to construct and operate a public off-street parking facility." These are permissive measures merely.

The city may, as it proposes here, lease its lands not otherwise needed for public use, governmental or otherwise, as a means of placing the provision of off-street parking in private hands for operation in competition with all other such facilities in the community. To hold that the prior use of a part of this plot for street-level parking, most if not all of the time under private management, and the contemplated use under the proposed lease for off-street parking commensurate with the public need, renders the land unleasable for that very use as land presently needed for a "public use," is to give the statute an unrealistic interpretation, at variance with what I conceive to be its obvious reason and spirit.

This is a contractual arrangement which is to be judged by its consequences. Although it will serve what is deemed to be a public need, it is essentially a private enterprise by the lessee, financed and sustained by private capital, and managed and operated, not by the municipality or a municipal agency such as a parking authority, but by private interests alone. By this plan, the municipality is not obliged to incur capital expenditures, directly or through an authority. And it is absolved of the burden and responsibility of management in the proprietary field. The choice of policy and means was the city's; and there is no suggestion of unreasonable or arbitrary action or abuse of power, of which more hereafter. The use of the authority technique is optional and in no sense exclusive. The primary design of this device is the financing of the project in hand without unduly restricting the local subdivision's borrowing power. The lessee's fulfillment of the contractual undertaking is no more a "public use" than

the provision of numerous other services rendered by private enterprise of much greater importance to the public weal, indeed indispensable, such as are provided by public utilities and the like, all financed and supported by private capital and directed by private management. It is pertinent to note that here the lease contract contemplates the use of part of the proposed parkade for strictly private businesses of various kinds unrelated to parking.

If a municipality may lease to a private person for a strictly private use lands not needed for a "public use," and there can be no doubt of this, indeed so much is conceded to be within the cited express legislative grant of power, then, *a fortiori*, it may lease lands for the provision of off-street parking facilities by private enterprise to supplement the selfsame service rendered by other private interests in the community. Can it be that the municipality is without power to contract for such service by the use of its lands unneeded for other public purposes? A parking authority created by the municipality under the Parking Authority Law, *N. J. S. A.* 40:11A–4, becomes an "agency and instrumentality" of the municipality; and the agency is given the power, *section* 40:11A–6(*b*) (*e*), "to construct, improve, maintain, operate, own, lease either in a capacity of lessor or lessee of land and facilities to be devoted to the parking of vehicles of any kind." The power of the creator municipality in this regard can hardly be less than its agent for such service. This would seem to be axiomatic. What is proposed here is but an incident of the municipality's province to render parking service, and to devote the particular lands to that use. And this conforms to the legislative concept. When *R. S.* 40:60–42 and *R. S.* 40:176–12 came into being, *L.* 1917, *c.* 152, *Art.* XVIII, *sec.* 4, 10, *L.* 1930, *c.* 143, the provision of off-street parking was not deemed a matter of public concern, and the subject matter of the present inquiry was not in the legislative view. The rapid increase in the volume of motor vehicle traffic gave rise to problems related to inadequate parking facilities; and the first of the statutory remedial

measures came in 1942, when the Legislature, *L.* 1942, *c.* 138, *N. J. S. A.* 40 :60–25.1, authorized the various municipalities to provide parking facilities, and was followed in 1948 by the Parking Authority Law, *L.* 1948, *c.* 198, *N. J. S. A.* 40 :11*A*–1, *et seq.*, vesting in the local authority as a municipal agency the power to lease its lands and parking facilities, thereby characterizing the function as private or proprietary or one that may be treated as such by the municipality. Justice Cardozo speaks of the problem of distinguishing between municipal activities governmental in nature and those corporate or private in character as one meriting legislative attention. 35 *Harv. L. Rev.* 113, 120. See, also, 34 *Harv. L. Rev.* 66; 38 *Harv. L. Rev.* 793, 795. The Legislature has spoken here. The provision of off-street parking facilities is a municipal function that may be fulfilled by private enterprise. And here the project involves the continuation not the frustration of the particular use.

The 1947 Constitution, *Art.* IV, *sec.* VII, *par.* 11, directs that the provisions of that instrument and of any law concerning municipal corporations formed for local government, or concerning counties, "shall be liberally construed in their favor"; and the powers of counties and municipal corporations shall include not only those granted in express terms, "but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law."

The principles and cases are treated in the annotation in 8 *A. L. R. 2d* 373, 389, 396. See, in particular, *Blank v. Browne,* 216 *App. Div.* 624, 216 *N. Y. Supp.* 664 (1926). There, the New York Appellate Division sustained the action of municipal park authorities in leasing to a private individual, for operation as a public parking place, a municipal park of about 14 acres which for some years had been operated by the park authorities as a public parking place for the convenience of the public patronizing an adjacent larger park and boardwalk. Compare *City and County of San*

*Francisco v. Linares,* 16 *Cal.* 2d 441, 106 *Pac.* 2d 369 (*Sup. Ct.* 1940) ; *Lowell v. City of Boston,* 322 *Mass.* 707, 79 *N. E.* 2d 713 (*Sup. Jud. Ct.* 1948), appeal dismissed in *Pierce v. City of Boston,* 335 *U. S.* 849, 69 *S. Ct.* 84, 93 *L. Ed.* 398 (1948). And see *Dorsey v. Stuyvesant Town Corporation,* 299 *N. Y.* 512, 87 *N. E.* 2d 541, 14 *A. L. R.* 2d 133 (*Ct. of App.* 1949), *certiorari* denied 339 *U. S.* 981, 70 *S. Ct.* 1019, 94 *L. Ed.* 1385 (1950), where the distinction is made between governmental function and action and the function of private enterprise; also *Philadelphia Rapid Transit Co. v. United States,* 8 *F. Supp.* 152 (*Pa. D. C. E. D.* 1934), holding that income earned by a public utility corporation operating a transportation system under a contract with a city, whereby the latter shared equally in the net earnings above a fixed percentage on the capital stock of the corporation and had certain other rights in its management and policies, is not exempt from federal income tax in respect of the portion to which the corporation was entitled under the contract.

Indeed, the plaintiffs in the taxpayers' suit acknowledge the existence of the basic power, but insist that its exercise is subject to the competitive bidding formula laid down in *R. S.* 40:50–1.

This statutory direction has no application here. It calls for competitive bidding where the contract involves "the doing of any work" or "the furnishing of any materials, supplies or labor, or the hiring of teams or vehicles," and the "sum to be expended exceeds" $1,000. The lease contract proposed here does not fall into any of these categories.

And it does not matter that competitive bidding was invited. There is in such circumstances no duty to accept the bid that has priority under the terms of the invitation. *Peter's Garage, Inc. v. City of Burlington,* 121 *N. J. L.* 523 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 227 (*E. & A.* 1939).

Moreover, while there was not a common definitive standard placing the bidders on an equal footing, the unsuccessful bidder has no standing to complain for the further reason

that, though tendering the bid as a corporate body, it had no corporate existence either at the time of submission or the time of the award, nor was it a *de facto* corporation. And so there was but one bidder.

But it is requisite that there be a *bona fide* exercise of the power to lease. The terms must be fair and just, and the action untainted by bad faith. There is no basis in the proofs for a finding that these criteria of conduct were disregarded by the governing body. It is suggested that there was a design to "stifle" bidding; but this is pure surmise unsupported by evidence. The plaintiffs themselves disavowed an intention to impute bad faith to the local rulers.

I would sustain the resolution under review and dismiss the complaint.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN— 6.

*For affirmance*—Justice HEHER—1.