703 A.2d 948

SEVELL'S AUTO BODY CO., INC.; PARKWAY VIEW SERVICE CENTER; D & E CORPORATION, INC.; POINT AUTO REPAIR, INC.; JOHNNY'S SERVICE CENTER; GRONE'S WRECKER & REC.; STOHRER BROS., INC.; AND NORMAN SEVELL, TAXPAYER, PLAINTIFFS–APPELLANTS, v. NEW JERSEY HIGHWAY AUTHORITY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 29, 1997—Decided December 2, 1997.

358

Before Judges BAIME, BROCHIN and WEFING.

*William J. Pollinger* argued the cause for appellants.

*William Harla* argued the cause for respondent (*DeCotiis, FitzPatrick & Gluck,* attorneys; *Mr. Harla,* on the brief).

*Harvey Fruchter* argued the cause for amici curiae/intervenors N.E.R.I. Corp. and Joseph Neri, taxpayer (*Harvey Fruchter*, attorneys; *Carrie Ferraro*, on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

This matter is a sequel to *N.E.R.I. Corp. v. New Jersey Highway Auth.*, 147 *N.J.* 223, 686 A.2d 328 (1996) (*N.E.R.I.*), in which our Supreme Court concluded that the New Jersey Highway Authority (Authority) was required to solicit public bids and award its contracts for towing and storage services on the Garden State Parkway (Parkway) to the lowest responsible bidder. In this matter, plaintiffs (hereinafter referred to generally as Sevell's) challenge the specifications that the Authority prepared in conjunction with its attempt to secure public bids for towing and storage contracts on the Parkway.

The trial court upheld the specifications and Sevell's appealed. We affirm.

The earlier history of this matter is set forth at length in the Court's opinion in *N.E.R.I.*, and we shall not repeat it here. On June 13, 1997, in accordance with the Court's directive in *N.E.R.I.*, the Authority publicly advertised for submission of bids for towing and storage contracts for eight separate segments or zones on the Parkway. On June 17, 1997, Sevell's sought and obtained an Order to Show Cause returnable on July 3, 1997 directing the Authority to show cause why the specifications should not be declared invalid. In Sevell's verified complaint, it listed by way of example three deficiencies within the specifications: a failure to require performance or consent of surety bonding; a failure to require submission of all mandatory qualification documentation simultaneously with submission of the bid itself; and an insufficient affidavit of moral integrity. Sevell's also asserted that the provision within the specifications which required the successful low bidder to pay a "contract fee" to the Authority was illegal.

On June 24, 1997, after issuance of the Order to Show Cause but prior to its return date, the Authority held a pre-bid conference with prospective bidders. In response to concerns and questions which arose at that meeting, the Authority, on July 1, 1997, issued certain clarifications and addenda to the specifications.

In response to the Order to Show Cause, the Authority filed a "Motion to Dismiss and/or for Summary Judgment." The trial court granted N.E.R.I. Corp. and Joseph Neri permission to appear as *amici curiae*.[1] After extensive legal argument on the return date, the trial court granted the Authority's motion for summary judgment.

## I.

To analyze plaintiffs' challenge, it is necessary to understand the framework the Authority employed in drafting these specifications. First, it divided the Parkway into sixteen separate segments or towing zones and solicited separate bids for eight of the zones. Towing companies were permitted to bid on more than one zone, but in that instance, they had to meet the required specifications separately for each zone.

The specifications covered a wide variety of topics. They included, for instance, detailed provisions on the broad insurance coverage required of each bidder and on the disclosure of ownership interests of the bidders. The specifications also required the bidders to have such various items as waiting and rest room facilities for customers, minimum hours of availability for release and surrender of vehicles and property, the ability to reach any disabled vehicle within twenty minutes of notification, and the capacity to store a minimum of seventy-five vehicles on property zoned for such long-term storage. The specifications also detailed the equipment that each potential bidder was required to have and the qualifications that the bidders' various employees needed.

---

[1] N.E.R.I. Corp. and Joseph Neri were granted leave to participate in this appeal, first as *amici curiae* and later as intervenors.

In addition to the above, the specifications directed the towing companies to provide their rates for eight separate categories of service, such as towing, tire change, battery boost, and storage; they also listed what the maximum permissible rate could be for each category. Under the procedure adopted by the Authority, the determination of the lowest overall bidder for each zone involved a weighted percentile rating process covering each of these eight separate service categories.

In recognition of the detailed qualification requirements, the Authority determined that bidders need not submit with their bids all of the documentation to establish that they met the qualifications; rather, all bidders had to submit with their bids:

1) a list of all vehicles that would be used during the contract term, including each vehicle's make, year, capacity, condition and registration number, together with copies of registration and proof of ownership or lease interest;

2) the name and address of their principal place of business and the location of any branch offices and storage facilities;

3) an executed affidavit of moral integrity; and

4) written certification that they met all bid qualification requirements at the time of bid submission.

If it was determined, after utilization of the weighted percentile rating process, that a particular towing company had submitted a low bid for a particular zone, the Authority would then call upon that tower to demonstrate through submission of specified items "and any other information or documents required by the Authority" that it did, indeed, on the date of bid submission, meet all the qualification requirements contained in the specifications.

Two other issues must be noted in connection with the specifications. They did not require bidders to submit a bid bond or performance bond. Rather, each bidder had to submit bid security of not less than $2,500 for each zone upon which it bid. This could be by way of bid bond, certified check or cashiers check. The bid security of the successful bidder would be retained; the

bid security of all others would be returned. The successful bidder did not have to submit any additional security.

Further, the specifications directed that any award of a contract was conditioned upon payment by the tower to the Authority of a certain annual minimum payment (which varied by zone) or 5% of the tower's gross monthly receipts, whichever was greater.[2] The Authority referred to this as a contract fee. The annual minimum fees ranged from $3,575 for milepost 25.7 to 31.7 to $42,996 for milepost 132 to 145.6.

On appeal, Sevell's argues that the post-bid submission of documents to demonstrate qualification is illegal, that the Authority is required to mandate use of a performance bond and that the contract fee is an illegal revenue raising measure. It also asserts that the addendum to the specifications which the Authority issued on July 1, 1997 is invalid since the Authority did not retain, within the specifications, the right to amend them.

## II.

■ We begin our analysis by noting that "[a] major objective of all public bidding statutes has been to promote the honesty and integrity of those bidding and of the system itself." *Keyes Martin & Co. v. Director, Div. of Purchase,* 99 *N.J.* 244, 256, 491 *A.*2d 1236 (1985).

> Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.
>
> [*Terminal Constr. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 409–10, 341 *A.*2d 327 (1975).]

---

[2] The addendum of July 1, 1997 clarified the gross receipts upon which the 5% was to be calculated.

It is, of course, essential to any system of honest public bidding that all bidders compete on the same terms.

> The conditions and specifications must apply equally to all prospective bidders. Otherwise, there is no common standard of competition. Every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders. So it follows that all bids must comply with the terms imposed, and any material departure therefrom invalidates a nonconforming bid as well as any contract based upon it. If this were not the rule, the mandate for equality among bidders would be illusory and the advantages of competition would be lost.
>
> [*Hillside Township v. Sternin,* 25 *N.J.* 317, 322–23, 136 *A.2d* 265 (1957) (Citations omitted).]

Our courts have long recognized the necessity for careful scrutiny in reviewing challenges to bidding procedures. "In this field it is better to leave the door tightly closed than to permit it to be ajar, thus necessitating forevermore in such cases speculation as to whether or not it was purposely left that way." *Id.* at 326, 136 *A.2d* 265.

Our Supreme Court has noted that these fundamental principles, which it originally enunciated in the context of the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49, are applicable to the bidding practices of the New Jersey Turnpike Authority. *George Harms Const. Co. v. N.J. Turnpike Auth.,* 137 *N.J.* 8, 36, 644 *A.2d* 76 (1994). There is no reason in logic or policy why these principles are not as equally applicable to defendant Highway Authority.

■ Finally, before proceeding to the specifications at issue here, we note that:

> bid specifications for public contracts shall be sufficiently full and explicit to notify prospective bidders of the kind and nature of the subject of the contract and set up a common standard of competition, in short, supply such information as will afford all bidders a fair and reasonable opportunity for competition and enable them to bid intelligently.
>
> [*George Harms Constr. v. Turnpike Auth., supra,* 137 *N.J.* at 36, 644 *A.2d* 76 (quoting *Camden Plaza Parking, Inc. v. City of Camden,* 16 *N.J.* 150, 159, 107 *A.2d* 1 (1954)).]

## A.

■ Sevell's first claim is that the equality and fairness essential to honest public bidding are impermissibly compromised by the Authority's decision that bidders may submit qualification documentation after submission of the bid itself. Such a procedure, it contends, permits an unqualified bidder to submit a bid but postpone the cost and burden of complying with all of the qualification requirements until after bid submission. In support of this contention, Sevell's relies upon the "[s]ettled principles of public bidding [which] dictate that no material element of a bid may be provided *after* bids are opened." *George Harms. Constr. v. Turnpike Auth., supra,* 137 *N.J.* at 37, 644 *A.*2d 76. A bidder may not agree, after bids have been opened, to supply an essential element that was missing from its bid. *Matter of Protest of Award of On–Line Games Production and Operation Services Contract,* 279 *N.J.Super.* 566, 598, 653 *A.*2d 1145 (App.Div.1995).

■ We are satisfied, however, that the specifications under review do not run afoul of these fundamental principles. All bidders are required to meet, on the bid submission date, certain detailed standards and must submit with their bids an executed certification that they are in full compliance with those requirements as of that date.

After the Authority reviews the bids and applies its percentile rating process to each, it will then select the low bidders for each of the eight zones and call upon them to submit at that time appropriate evidence of their qualifications in terms of the bid specifications. Those low bidders must demonstrate, however, that they met all of the qualification requirements as of July 21, 1997, the bid submission date. Nothing within the specifications would permit the scenario which Sevell's envisions, and we are fully confident of the Authority's ability to ferret out any attempt to circumvent the July 21, 1997 deadline.

In our judgment, the Authority's decision to proceed in this manner is an appropriate exercise of the discretion vested in it, for it seeks to minimize the administrative burden and expense both for the bidders and for itself while assuring that all bidders are proceeding on an equal basis. The Authority should not be compelled to employ the most cumbersome and costly method if it can achieve the same ends and provide the same protections in a simpler and easier manner.

As part of its challenge to this portion of the specifications, Sevell's also attacks the provision which permits the Authority, during the post-bid evaluation process, to obtain "any other information or documents required ... [in order] to verify [bidder] qualifications and responsibility." Sevell's argues that this language is vague and does not comply with the requirement that specifications be "full and explicit." *Camden Plaza Parking, Inc. v. City of Camden, supra,* 16 *N.J.* at 159, 107 *A.*2d 1. The language, however, should not and cannot be analyzed in a vacuum. Rather, it should be considered within its particular context, both textual and factual.

We perceive no facial invalidity. Sevell's challenge is to the specifications themselves, and not to a contract award. Because the appeal before us is directed solely to the specifications, we have no occasion in this matter to decide whether a particular document the Authority may call for in the future should be submitted. We leave that issue for resolution in a future matter, in which an appropriate record could be developed.

### B.

Sevell's next contention is that the "contract fee" required by the specifications constitutes an illegal revenue raising measure. It maintains that there is no case law, enabling statute or regulation that specifically permits the Authority to charge a fee in exchange for authorization to perform services on the Authority's property.

We decline to attach any legal significance to the fact that plaintiff Sevell's Auto Body Co., Inc. itself paid a similar fee for the many years it held a contract with the Authority for towing and storage services prior to the decision in *N.E.R.I., supra.* We prefer to deal with the issue of whether the Authority can validly require the payment of such a fee.

In defense of such a practice, the Authority relies upon *N.J.S.A.* 27:12B–5(i) and *N.J.S.A.* 27:12B–14. It also asserts that the contract fee at issue is not a revenue raising measure and is thus not illegal.

Initially, we are satisfied that *N.J.S.A.* 27:12B–14, which permits the Authority to "fix, revise, charge and collect tolls and charges for the use of each project and the different parts or sections thereof", is clearly inapplicable in light of the Supreme Court's direct statement in *N.E.R.I., supra,* that *N.J.S.A.* 27:12B–14 "applies only to 'projects which require acquisition of an interest in Authority property, such as by easement, license or lease.'" 147 *N.J.* at 231, 686 *A.*2d 328 (quoting *N.E.R.I. Corp. v. New Jersey Highway Auth.,* 282 *N.J.Super.* 460, 464, 660 *A.*2d 564 (App.Div. 1995)). In this case, a successful bidder does not acquire an interest in any of the Authority's property.

Under *N.J.S.A.* 27:12B–5(i), as part of its enumerated powers, the Authority may "fix and revise from time to time and charge and collect tolls and other charges for transit over or use of any project acquired or constructed by it." We recognize the parallel structure between *N.J.S.A.* 27:12B–5(i) and 27:12B–14. We do not, however, consider it necessary in this matter to determine whether *N.J.S.A.* 27:12B–5(i) does permit the Authority to assess such a contract fee as a revenue raising measure for we are satisfied that, on the record presented to the trial court, it is not a revenue-raising measure.

As we noted earlier, the Authority responded to the Order to Show Cause by filing a "Motion to Dismiss and/or for Summary Judgment." The Authority followed the procedure outlined in *R.*

4:46–2(a) and filed a Statement of Material Facts, with supporting certifications. Sevell's filed nothing in opposition under *R.* 4:46–2(b), nor did it contend that it needed discovery before doing so.

The trial court thus had before it the Authority's statement that the "license fees raised from towing operators do not cover the full administrative costs of the Authority in administering its towing program and raise approximately only two-thirds of the cost of administration of the towing program." To support that statement, the Authority submitted the certification of Patricia Mooney who had served as the Authority's Roadway Services Administrator for eight years. As that Administrator, she was responsible for coordinating towing and related services on the Parkway. According to Ms. Mooney's certification, the Authority had received approximately $219,000 in towing license fees and approximately $9,000 in radio maintenance fees in 1996. Ms. Mooney further certified that it cost the Authority approximately $347,000 to administer its towing program for that period. The Authority thus demonstrated that its administrative costs exceeded the money raised through collection of the contract fee.

We consider the Authority's use of this contract fee analogous to a municipality's right to charge a license fee under its general regulatory powers, so long as the fee is reasonably related to its regulatory expenses. *Bernardsville Quarry, Inc. v. Borough of Bernardsville,* 129 *N.J.* 221, 228–29, 608 *A.*2d 1377 (1992); *See Gross v. Ocean Township,* 92 *N.J.* 539, 457 *A.*2d 836 (1983). As the contract fee at issue is reasonably related to the Authority's administrative costs, we find the fee permissible.

### C.

■ Sevell's next argues that the Authority improperly amended the specifications by issuing the addendum of July 1, 1997 when the specifications themselves did not state that the Authority retained the power of amendment. We are not persuaded by that contention.

The Authority conducted a mandatory pre-bid conference on June 24, 1997. Any tower who did not attend the conference would not be permitted to submit a bid. The purpose of the meeting was to review the specifications, answer inquiries and ensure that all understood the bid requirements. The Authority issued the addendum to all who attended the mandatory pre-bid conference. Thus, no bidder was placed at a disadvantage; all received the same information for utilization in formulating their bids.

We note further in this regard that the specifications provided that any prospective bidder could submit written questions to the Authority about the specifications by June 27, 1997, to which the Authority would respond in writing by July 3, 1997. The specifications thus notified potential bidders that further material might be forthcoming. Finally, *N.J.A.C.* 19:8–5.3(e) contains a time frame for amendment of specifications; such a time frame would be unnecessary if the Authority lacked the power to amend.

### D.

Finally, Sevell's challenges the fact that the specifications failed to require the submission of either a performance or surety bond as security. We see no merit to this contention. *R.* 2:11–3(e)(1)(E). We consider the decision as to which form of security best protects the Authority and its patrons a discretionary determination. We have absolutely no basis to conclude that the Authority has abused its discretion in this regard.

Finally, we note for the sake of completeness that there is also no merit to the contention of intervenors N.E.R.I. Corp. and Joseph Neri that Sevell's lacks standing to challenge these specifications. Sevell's commenced this action prior to the bid submission date. It therefore has not acted in disregard of *Waszen v. Atlantic City*, 1 *N.J.* 272, 63 *A.*2d 255 (1949), which held that an

unsuccessful bidder lacks standing to challenge the specifications under which its unsuccessful bid was submitted.

Affirmed.