748 A.2d 649

NORMAN SEVELL, PLAINTIFF–APPELLANT, v. NEW JERSEY
HIGHWAY AUTHORITY AND N.E.R.I. CORP., TRADING AS
L & J AUTO BODY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 29, 2000—Decided April 13, 2000.

Before Judges CARCHMAN, LEFELT and LINTNER.

*William J. Pollinger*, argued the cause for appellant.

*William Harla*, argued the cause for respondent New Jersey Highway Authority (*DeCotiis, Fitzpatrick & Gluck*, attorneys; *Mr. Harla*, of counsel; *Gina Bilangi Carle*, on the brief).

*Harvey Fruchter*, argued the cause for respondent N.E.R.I. Corp. (*Mr. Fruchter* and *Renee S. Rothschild*, on the brief).

The opinion of the court was delivered by

CARCHMAN, J.A.D.

This appeal requires us to address whether a zero ($0) bid for towing, mileage, road service, tire change, fuel, oil and/or water call, battery boost, storage charges, winching or labor (collectively "the towing services") on a section of the Garden State Parkway is void *per se* as a matter of public policy. The effect of such bid is that the towing services would be provided to motorists free of charge. The Law Division held that such bid was proper. We agree and affirm.

This appeal is but another chapter in an ongoing dispute between plaintiff Norman Sevell, and defendants the New Jersey Highway Authority (the Authority) and N.E.R.I. Corp. t/a L & J

Auto Body (NERI) regarding bidding for towing services on a portion of the Garden State Parkway (Parkway) identified as the Union County Zone (Mile Post 132.0 to 145.6). The background of the prior disputes and history of the selection process for towing services on the Parkway is set forth in *N.E.R.I. Corp. v. New Jersey Hwy. Auth.*, 147 *N.J.* 223, 686 *A.*2d 328 (1996), where the Supreme Court held that towing services must be awarded in compliance with the applicable bidding statute, *N.J.S.A.* 27:12B-5.2, and *Sevell's Auto Body v. New Jersey Hwy. Auth.*, 306 *N.J.Super.* 357, 703 *A.*2d 948 (App.Div.1997), *certif. denied*, 153 *N.J.* 51, 707 *A.*2d 154 (1998), where plaintiff unsuccessfully challenging the bidding specifications established by the Authority.

Since the opening of the Parkway, plaintiff has continually been awarded the towing contract and provided towing services in the Union County Zone.[1] At the time competitive bidding was required as a result of the Court's decision in *N.E.R.I.*, Sevell's charges for the towing services included a forty-five dollar charge for towing plus a mileage charge of $2.25 and a fifteen dollar charge for road service, tire change, fuel oil or water, battery boost and storage. These charges were within the limits established by the Authority, *see N.J.A.C.* 19:8–2.12, although towers were not precluded from charging less than the authorized amount.

The relevant provisions of the bidding specifications required the successful bidder to tow to its garage or the nearest exit. Alternative arrangements could be made with the vehicle owner in which case, the bid rates would not apply. If the vehicle was taken to the bidder's garage, the specifications required that any

---

[1] In this action, unlike the two prior cited cases, Sevell sued in his individual capacity as a taxpayer rather than in a corporate capacity as an unsuccessful bidder. Notwithstanding that distinction, his interests in the outcome of this appeal are the same in either capacity, and we make no distinction between the two. In fact in his certification filed in the Law Division, plaintiff identifies himself as a "citizen," "taxpayer" and "tower within the State of New Jersey who also submitted a bid to the Highway Authority."

repair services provided must be authorized by the vehicle owner, in writing, and that "charges to the motorist for parts repairs, labor, and service for each vehicle ... shall in no event exceed the rates covered in current edition 'Auto Repair' or 'Flat Rate and Parts' manuals or 'Chiltons' manuals." Additionally, the specifications set forth standards for the tower's response time and facilities and finally, obligated the successful bidder to pay an annual minimum contract fee to the Authority of $42,996 or five percent of the gross receipts of services rendered, whichever is greater.

When the bids were received, NERI submitted a bid reflecting a zero ($0) bid for the towing services. The next lowest bid was by MTS Tow Services, with a weighted bid of $15.15 and the third lowest bid was by plaintiff's corporation, with a weighted total of $28.18. (The Authority weighed each of the elements of the towing services provided to arrive at a weighted bid. No one challenges the weighing process.) The bid prices reflected, not a charge to the Authority, but a charge to the motoring public for the towing services provided by the bidder.

After the contract was awarded to NERI, plaintiff filed an action in the Law Division challenging NERI's zero bid. Plaintiff also challenged the timing of the award of the contract, and the trial judge concluded that the Authority did not violate *N.J.A.C.* 19:8–5.13(e) (requiring an extension of bids if an award is not made within forty-five calendar days of bid opening); this issue is not implicated on this appeal.

Following preliminary discovery, the parties filed cross-motions and agreed that the issue could be decided as a matter of law. Judge Pisansky granted defendants' motions for summary judgment concluding that zero bids were not invalid as a matter of law, thereby upholding the bid award. This appeal followed.

On appeal, plaintiff reasserts that a "zero bid never was, is not and should never be a valid bid in the State of New Jersey." In asserting this claim, plaintiff again concedes that the issue is

narrow and can be resolved as a matter of law, eschewing any suggestion that NERI is not a responsible bidder or that the Authority is incapable of administering the contract consistent with the specifications.

Our analysis of the issue raised requires a brief restatement of applicable principles of public bidding law. Public bidding statutes exist for the good of taxpayers, not bidders, and they must always be construed for the public good and to guard against "favoritism, improvidence, extravagance and corruption." *N.E.R.I., supra,* 147 *N.J.* at 235, 686 *A.*2d 328. The primary objective of these statutes is to achieve the honesty and integrity of the bidders and the bidding process. *Sevell's, supra,* 306 *N.J.Super.* at 363, 703 *A.*2d 948. Bidding statutes are designed to protect the public through "fair and open competitive bidding." *Lord v. Municipal Util. Auth.,* 133 *N.J.Super.* 503, 506, 337 *A.*2d 621 (App.Div.1975). "The purpose is to secure competition . . . they should be construed with sole reference to the public good; and they should be rigidly adhered to by the courts." *Hillside Twp. v. Sternin,* 25 *N.J.* 317, 322, 136 *A.*2d 265 (1957).

> To achieve these purposes[,] all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.
>
> [*Terminal Const. Corp. v. Atlantic Cty. Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.*2d 327 (1975).]

We have recognized the necessity of utilizing the bidding process to protect the public and have commented that "[a]ny stifling of competition undermines the policy of" open public bidding. *Armaniaco v. Cresskill,* 62 *N.J.Super.* 476, 481, 163 *A.*2d 379 (App.Div.1960). This finding is consistent with the goal of open and competitive bidding, which is to protect the public; this includes providing the public with the lowest possible contract price, subject to sufficient quality controls. If there is no showing that the bidding procedure or the bid specifications undermine the principles of fair and competitive bidding, there is no reason to

invalidate a winning bid. *Riverland Const. Co. v. Lombardo Contracting,* 154 *N.J.Super.* 42, 47, 380 *A.*2d 1161 (App.Div.1977), *aff'd o.b.,* 76 *N.J.* 522, 388 *A.*2d 626 (1978). Furthermore an absence of factors which undermine the integrity of the bidding process insures that the public receives the benefit of the lowest possible contract price. *Id.* at 46–47, 380 *A.*2d 1161.

Plaintiff's primary argument is premised on the assertion that NERI has made a "predatory" bid "below cost, impossible and presumptively evil-intended." He claims that as a zero bid, the bid should be set aside as a matter of public policy. We most recently addressed the issue of a zero bid in *Turner Const. Co. v. New Jersey Transit Corp.,* 296 *N.J.Super.* 530, 687 *A.*2d 323 (App.Div.1997). In *Turner,* the bidder bid zero dollars for one item out of a multi-item bid; appellant asserted that the bid "should be considered no bid at all." *Id.* at 537, 687 *A.*2d 323. We observed:

> An unbalanced bid is one "based on nominal prices for some work and enhanced prices for other work;" *Frank Stamato & Co. v. City of New Brunswick,* 20 *N.J.Super.* 340, 344, 90 *A.*2d 34 (App.Div.1952). However, a "reasonable unbalancing is perfectly proper." *Riverland Construction Co. v. Lombardo Contracting Co.,* 154 *N.J.Super.* 42, 47, 380 *A.*2d 1161 (App.Div.1977), *aff'd,* 76 *N.J.* 522, 388 *A.*2d 626 (1978). Thus, the submission of an unbalanced bid standing alone does not invalidate the bid. *Frank Stamato & Co., supra,* 20 *N.J.Super.* at 344, 90 *A.*2d 34.

> The submission of a zero bid is similar to that of a nominal "penny" bid. A nominal bid is not "inherently evil or destructive of fair and competitive bidding." *Riverland Construction Co., supra,* 154 *N.J.Super.* at 46, 380 *A.*2d 1161. "Every contractor may apply his own business judgment in the preparation of a public bid, and his willingness to perform one of the items for a nominal amount is but his judgmental decision in an effort to underbid his competitors." *Id.* at 47, 380 *A.*2d 1161.

> As we stated in *Riverland:*

>> [i]n the absence of a factual showing that such a decision subverts the principles of fair and competitive bidding there is no reason to invalidate the resulting bid. The pejorative connotation of the phrase 'unbalanced bid' comes into play only when the nominal bid on one item is unbalanced because of an excessive bid on other items, or because of other elements pointing to fraud, collusion, unfair restriction of competition or other substantial irregularity. Reasonable unbalancing is perfectly proper.

[*Ibid.; cf. Hall v. N.J. Sports & Exposition Authority*, 295 *N.J.Super.* 629, 685 *A.*2d 983 (App.Div.1996) (A nominal or no charge bid is not the same as no bid at all and the latter may be a material deviation).]

Here, the Transit Authority concluded that there was no proof of collusion or fraudulent conduct on the part of the bidder or the procuring agency nor was there proof of any other substantial irregularity affecting fair and competitive bidding. Accordingly, the authority concluded, and we agree, that this objection is without merit.

[*Id.* at 537–38, 687 *A.*2d 323.]

Earlier, in our decision in *Riverland Construction Co., supra,* 154 *N.J.Super.* at 45, 380 *A.*2d 1161, where a bidder had submitted a penny bid on one of thirty-eight bidding items with a total contract price of $300,000, we concluded that such bid is not "inherently evil or destructive of fair and competitive bidding." *Id.* at 46–47, 380 *A.*2d 1161. We did, however, reference Judge Conford's concurring opinion in *Armaniaco,* where he observed that such bids must be carefully scrutinized "where the practice indulged is one clearly conducive to fraud, collusion, or defeat of the principles of fair and competitive bidding." *Id.* at 487–88, 163 *A.*2d 379.

It is against this analytical backdrop that we examine the bids challenged on this appeal. NERI urges that its zero bids represent a business judgment premised on its recouping the costs attached to its towing and road service operations through the body and repair services that will obviously flow from the towing operations. Not only does such reasoning appear to represent sound business judgment, but such a scenario was anticipated by the Court in its earlier decision in *N.E.R.I.* In concluding that the towing services were subject to competitive bidding, the Court observed: "Moreover, by selecting a tower to service one zone, the Authority is granting that tower a monopoly and the ability *to make substantial sums of money not only by providing towing and roadside services, but also by repairing motorists' defective vehicles.*" *N.E.R.I., supra,* 147 *N.J.* at 235, 686 *A.*2d 328 (emphasis added).

Plaintiff argues that the zero bid is destructive of fair and competitive bidding and exposes the public to fraud and corruption. Inherent in plaintiff's argument is the suggestion that

"fraud and corruption" will ensue at the garage where NERI must recover the costs of providing free towing services. Plaintiff infers that such scenario encourages nefarious conduct to the detriment of the public. We reject this argument. We again observe that the Authority has taken contractual steps to regulate the fee structure for services. More significantly, however, we perceive no greater or lesser opportunity for inappropriate dealing with the public when a motorist's vehicle has been removed to the tower's garage and been charged nothing for the tow or has been charged forty-five dollars for the same service. The "captivity" of the vehicle owner creates the opportunity for inappropriate conduct not the cost of "capturing" that motorist[2]. Additionally, the Authority has taken steps to avoid this problem by requiring the successful bidder to tow a stranded motorist to its garage *or the nearest exit;* that choice lies with the motorist.

We also observe that the symmetry of the bidding in this case is substantially different from that described in *Armaniaco, Riverland* or *Turner.* The bidding in those cases involved services being provided directly to the contracting party. The potential for fraud and abuse *in the bidding process* alluded to in our prior decisions lies in, among other things, those circumstances where a bidder has "inside" information pertaining to relevant circumstances impacting on the bid. In this case, the zero bid is for services being provided to third parties—the motoring public—who will be the prime beneficiaries of the zero bid. We find little substance in plaintiff's argument that this amounts to some measure of predatory pricing or unfairness or presents an opportunity for fraud or corruption in bidding.

NERI's motivation for its bid is expressed and open. It has demonstrated a willingness to assume a business risk, to absorb

---

[2] At oral argument, NERI's attorney represented that NERI had towed approximately 21,000 vehicles during the administration of the contract. While such information is not part of the record, we need only take judicial notice that there are a substantial number of vehicle breakdowns on the highways of this State, including the Parkway which require towing services.

the cost of towing services on the premise that it will recoup such expenses in the repair services provided. Perhaps this operates to the detriment of plaintiff but not to the detriment of the motoring public. We fail to fully grasp why the bidding process will be better served by the motoring public paying $28.18 for towing services, plaintiff's weighted bid, when the same service is offered by the successful bidder for nothing. *Cf. Cataldo Ambulance Serv. v. City of Chelsea,* 426 *Mass.* 383, 688 *N.E.*2d 959, 960–61 (1998) (noting that both bidders bid zero dollars for providing ambulance services to the city). The argument that such bid is more legitimate seems to defy logic.

We again reiterate what we observed earlier; no challenge is made to NERI's ability to perform, its responsibility as a bidder or the ability of the Authority to properly insure, through administration of the contract, that the public interest is being served and that the services provided by the successful bidder are in accordance with the standards set by the Authority. This is what the public bidding laws require, and if the public receives the full benefit of the contract at potentially no cost, then the intent of the bidding laws, as well as fair competition, is well served.

Affirmed.