259 N.J. Super. 377 (1992)
613 A.2d 511
AGORGANIC, INC., PLAINTIFF,
v.
OCEAN COUNTY UTILITIES AUTHORITY AND SPECTRASERV, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Ocean County.
Decided August 10, 1992.
*380 Peter J. Herzberg for plaintiff (Pitney, Hardin, Kipp & Szuch).
Richard H. Woods for defendant Ocean County Utilities Authority (Hiering & Dupignac).
Gage Andretta for defendant Spectraserv, Inc. (Wolff & Samson).

OPINION
SERPENTELLI, A.J.S.C.
This opinion considers the scope and application of the exception to the Local Public Contracts Law permitting negotiation of contracts for the marketing of recyclable materials. N.J.S.A. 40A:11-5(s). The issues are novel and there is no guiding precedent.
On February 7, 1992, the Ocean County Utilities Authority [hereinafter OCUA] solicited public bids for the removal and disposal of sludge from its Northern, Central and Southern Water Pollution Control Facilities [hereinafter Northern, Central and Southern plants]. The OCUA is in the process of developing a sludge management facility which converts sludge waste into a fertilizer. The OCUA was seeking bids for the emergency supplemental disposal of sludge for periods when the facility is either not operating due to required maintenance or when the sludge volume exceeds the capacity of the facility to convert it to fertilizer.
The bid specifications left the method of disposal to the discretion of the bidder subject to compliance with all applicable laws, rules and regulations. Landfilling, incineration, other types of land disposal and conversion of the sludge into a recycled product were permitted. All bidders were required to *381 submit a statement of the proposed method of disposal as well as documentation confirming that the designated disposal facilities had the capacity to accept the sludge produced under the contract. The specifications also gave the OCUA the right to reject all bids or alternatively, "to enter into negotiations for the disposal of the sludge through a recycling program" pursuant to N.J.S.A. 40A:11-5(s).
On March 2, 1992, four bids were received. The low bidders were Spectraserv, Inc. [hereinafter Spectraserv] for the Northern plant and Agorganic, Inc. [hereinafter Agorganic] for the Central and Southern plants. Spectraserv proposed three forms of disposal. The primary means was to be incineration. The remaining sludge was to be beneficially reused[1] through land application from March 15 to November 15, 1992. During the period in which the sludge could not be land applied, it was to be transported to Spectraserv's processing plant in Kearney, New Jersey. The residual waste generated by the Kearney facility [dewatered sludge] was to be taken to out-of-state landfills for ultimate disposal.
Agorganic's bid also offered three methods of disposal. It proposed to beneficially reuse the sludge by converting it into an agricultural liming agent, to land apply it at its facility in Phillipsburg, New Jersey or to transport dewatered sludge to a landfill in West Virginia.
Subsequently, both Agorganic and Spectraserv contacted the OCUA and requested an opportunity to negotiate pursuant to the bid specifications. On March 5, 1992, representatives of the OCUA and Spectraserv met. The OCUA advised Spectraserv that any negotiated proposal must include a commitment to recycle. Spectraserv offered a "package deal" whereby sludge from the Central and Southern plants would be disposed of by various recycling methods and lowered its bid price for those *382 facilities. It continued to propose incineration as the primary means of disposal for the Northern plant and did not change its price for that facility.
On March 11, 1992, representatives of the OCUA and Agorganic met. Agorganic was also advised that any negotiated agreement must include recycling. Agorganic lowered its bid price for the Northern plant but adhered to its original bid prices for the Central and Southern plants. It proposed to recycle the sludge from all three facilities.
Later that day, members of the OCUA staff and its counsel determined that the contract for all three facilities should be awarded to Spectraserv. The OCUA contacted Spectraserv and asked that it confirm the prices tendered on March 5, which Spectraserv did by letter of that date.[2] The OCUA staff recommended to its Commissioners that it would be in its rate payers best interests to grant Spectraserv the contract for all three plants. A special meeting was scheduled so that the contract could be awarded on March 16, the day immediately following the expiration date of the prior contract. Due to a failure to comply with the notice requirements of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq., the March 16 meeting was cancelled and rescheduled for March 26. In the interim, the OCUA allowed Spectraserv to handle the sludge on a temporary basis until a contract could be formalized.
On March 17, Agorganic wrote to the OCUA challenging Spectraserv's ability to perform the contract and submitting new prices for all three plants. Essentially, Agorganic asserted that Spectraserv did not have sources available which would enable it to beneficially reuse the sludge in accordance with the *383 OCUA's requirements. At the OCUA's regular meeting on March 26, Agorganic's counsel presented a detailed analysis of its objections to Spectraserv's proposal. After hearing arguments from both bidders, the OCUA adopted a resolution awarding the contract to Spectraserv.
On March 27, Agorganic filed a Complaint in Lieu of Prerogative Writs and an Order to Show Cause seeking to restrain the OCUA and Spectraserv from entering into the contract awarded on March 26. On March 31, the court entered an order temporarily enjoining the defendants from executing the contract but permitting Spectraserv, pending the outcome of the litigation, to remove the sludge from the three facilities under an interim arrangement with the OCUA.

I. SCOPE OF THE EXCEPTION
N.J.S.A. 40A:11-5 creates a series of exceptions to the bidding requirements under the Local Public Contracts Law. That statute provides, in part:
Any purchase, contract or agreement of the character described in section 4 of this act may be made, negotiated or awarded by the governing body without public advertising for bids and bidding therefor if:
(1) The subject matter thereof consists of:
(s) The marketing of recyclable materials recovered through a recycling program, or the marketing of any product intentionally produced or derived from solid waste received at a resource recovery facility or recovered through a resource recovery program, including, but not limited to, refuse-derived fuel, compost materials, methane gas, and other similar products;
As a threshold issue, the court must address the scope of the recycling exception before it becomes necessary to determine whether the exception has been properly applied in this case. The plaintiff argues that the negotiated contract must require recycling of all sludge, as opposed to only partial recycling. The defendants contend that Spectraserv's proposal satisfies *384 the statutory objectives.[3]
As discussed above, Spectraserv intends to incinerate the sludge emanating from the Northern plant. All parties concede that incineration does not constitute beneficial reuse. Therefore, Spectraserv's proposal does not envision a complete recycling of sludge from the three OCUA plants. On the other hand, Agorganic offered to beneficially reuse all of the sludge.
Agorganic asserts that permitting negotiation for partial recycling would allow public entities, intent on favoring a particular bidder, to avoid formal bidding merely by adding an insignificant recycling component to any sludge disposal specifications. The plaintiff also contends that partial recycling programs will not stimulate the technological advancement promoted by the statutory exception. It reads the exception as a means of encouraging public bodies to recycle their waste and private industry to invest in and develop processes which will accomplish that purpose.
Spectraserv counters that Agorganic's position seeks to exclude competition because only Agorganic has the capacity to beneficially reuse all of the sludge at its facility. It must be acknowledged, however, that there is nothing in the specifications which requires all of the beneficial reuse to be at one location or which prevents Spectraserv from making arrangements for recycling through various means at different sites. Furthermore, Agorganic also left open the possibility that it might recycle at locations other than its own.
The legislative history relating to the enactment of N.J.S.A. 40A:11-5(s) does not provide the court with any substantial evidence of legislative intent regarding its scope. This exception was not part of the Local Public Contracts Law as originally enacted. By Chapter 102, Section 32 of the Laws of 1987, a *385 recycling exception was added to N.J.S.A. 40A:11-5 but was limited to "[t]he marketing of recyclable materials recovered through a recycling program." There is no legislative history to explain the breadth of that provision. Chapter 92 of the Laws of 1989, known as the Solid Waste Management Act (N.J.S.A. 13:1E-1 et seq.), expanded the exception to add the other language now included in N.J.S.A. 40A:11-5(s) as set forth above. The statement accompanying the Assembly Bill which ultimately became law, similarly does not provide any insight into legislative intent.
By authorizing negotiation of contracts for the marketing of recyclable materials, the Legislature could have been seeking to further several important policies. First, by utilizing negotiations, the OCUA has leverage to obtain better prices through the give and take of bargaining. Indeed, the evidence before the court suggests that the OCUA obtained lower prices through negotiations than it did through formal bids.
Second, by allowing the OCUA flexibility in the contract process, recycling is encouraged. The objectives underlying the Solid Waste Management Act are reflected in N.J.S.A. 13:1E-2. There, the Legislature found that the collection, disposal and utilization of solid waste is a matter of grave concern to all of our citizens. The Legislature recognized the need for the efficient collection and disposal of solid waste or its appropriate utilization. Consistent with these purposes, the Legislature set out, in the same section, various policies to accomplish those goals. Presumably, the amendment of the Local Public Contracts Law in the Solid Waste Management Act was intended to help effectuate those objectives.
In keeping with the purposes of the Solid Waste Management Act, the Department of Environmental Protection and Energy formalized a revision of the Statewide Sludge Management Policy Guidelines to further encourage beneficial reuse. Those guidelines recognize that recycling of sludge advances the state pollution strategy, returns material as a useful product to the *386 biosystem rather than destroying or burying it, focuses individual household and business attitudes towards environmentally preferred methods of sludge management, avoids the cumulative impact of incineration and respects the waste management systems of other states.
None of these laudable goals would be hindered by permitting negotiation of partial recycling contracts. Even a contract for partial recycling will accomplish those objectives to some extent. On the other hand, to require complete recycling could impede statewide reuse efforts by driving up prices due to such factors as the limited number of recycling sites, the limited number of companies capable of producing sludge derived products or the added costs of recycling as compared to mere disposal of the sludge.
As noted earlier, the plaintiff argues that permitting negotiation for partial recycling creates the potential of favoritism by enabling the bidding agency to circumvent the bidding process merely by adding a minimal recycling component to a contract that would otherwise have to be formally bid. However, the opportunity for abuse of discretion is built into the statute since the OCUA has several options to arrange for the disposal of its sludge, each of which creates the opportunity for favoritism. It has the right to solicit formal bids which could require complete or partial recycling or allow the bidder total discretion, including the option not to recycle at all. Additionally, N.J.S.A. 40A:11-5(s) permits the OCUA to negotiate a contract for recycling of sludge without ever soliciting bids in the first instance. Of course, the OCUA can do both, take bids and thereafter reject the bids previously submitted and then enter into negotiations with those bidders.
Furthermore, the potential for abuse is present whether negotiations involve partial or complete recycling. The Legislature is presumed to have knowingly sanctioned the risks involved. Moreover, the possibility of favoritism is counterbalanced first, by the benefits which can accrue through negotiations *387 and second, by the fact that any arbitrary, capricious or unreasonable action remains subject to court challenge.
Finally, sanctioning the negotiation of partial recycling promotes the opportunity for the development of new recycling techniques. Since much of this technology is still in its infancy, it is appropriate to give the bidding agencies some room to utilize reasonable discretion through negotiations so that the objectives of recycling efforts can be encouraged. That necessary flexibility would be constrained if the bidding agency sought to develop formal specifications since precedent requires that the specifications be clear, unequivocal and understandable to all bidders. Shakel v. North Bergen Tp., 37 N.J. 369, 378-79, 181 A.2d 473 (1962). Given the state of flux in the recycling field, insisting upon precise specifications might inhibit prospective bidders from proposing more beneficial or cost efficient methods. Conversely, the bidding agency, in an effort to obtain the best recycling methods available, might develop specifications which are not sufficiently precise to comply with the law. If the bidding agency's hands are too closely tied, it might find it more convenient to follow formal bidding procedures. However, that might result in the agency being unable to take advantage of changing technology or being precluded from obtaining any recycling.
As our Supreme Court said in Terminal Construction Corp. v. Atlantic County Sewerage Authority, 67 N.J. 403, 341 A.2d 327 (1975):
Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. [at 409-10, 341 A.2d 327].
In the court's judgment, that policy is best realized by allowing the OCUA to exercise its discretion in a reasonable manner to achieve the greatest degree of recycling attainable, consistent with its economic well being.

II. APPLICATION OF THE EXCEPTION
Having determined the scope of the exception and concluded that the OCUA was permitted to negotiate a partial recycling *388 contract, the court must decide whether the OCUA properly applied the exception by awarding the contract to Spectraserv. In this regard, Agorganic raises several arguments in support of its contention that the OCUA abused its discretion in awarding the contract. They include:
A. Spectraserv has insufficient recycling capacity to perform the contract.
B. The OCUA was not diligent in investigating Spectraserv's capacity to perform.
C. The OCUA conducted the negotiations unfairly.
D. The OCUA abused its discretion in awarding a contract which was not in the best interests of the rate payers.
In considering these arguments, the court is mindful of the well established restrictions on its scope of review. A reviewing court may not reverse the decision of a municipal body unless it finds the decision to be arbitrary, capricious or unreasonable. Palamar Const., Inc. v. Pennsauken Tp., 196 N.J. Super. 241, 250, 482 A.2d 174 (App.Div. 1983). Even if doubt is entertained as to the wisdom of the action, the court cannot substitute its judgment for that of the board in the area of factual disputes. Thus, there can be no judicial finding of invalidity in the absence of an abuse of that discretion. Kramer v. Board of Adjustment of Sea Girt, 45 N.J. 268, 296-97, 212 A.2d 153 (1965). The court now turns to the plaintiff's arguments in the order listed above.

A. Spectraserv's Ability to Perform the Contract.

The plaintiff asserts that, based upon its investigation, Spectraserv has insufficient recycling capacity to perform the contract. By letters dated March 17 and March 25, 1992, Agorganic critiqued each of Spectraserv's proposed disposal sites. The OCUA held a hearing on March 26, at which time both sides were given an opportunity to address the issue of Spectraserv's capacity to beneficially reuse the sludge in accordance with its proposal. Again, Agorganic attacked each of the anticipated sites, raising issues such as capacity to accept the sludge, the physical make up of the site, the absence of state permits or the lack of firm agreements to permit utilization of *389 some of those sites. Agorganic also maintained that Spectraserv intended to commingle some of the OCUA's sludge with other sludge and dispose of it at a landfill thereby depriving the OCUA of the ability to determine whether its sludge was, in fact, being beneficially reused.
Spectraserv responded that its sites represented a mixture of outlets designed to give it flexibility in assuring adequate disposal. It disputed many of Agorganic's factual contentions concerning site capacity, permits and commitments from the various landfills. Spectraserv also claimed that it continued to seek additional sites beyond those made known to the OCUA.
Similar conflicting testimony was introduced in the plenary hearing before this court. Again, Agorganic sought to discredit the proposed disposal sites and Spectraserv undertook to validate both its proposed sites and its ability to do whatever was necessary to beneficially reuse the sludge in accordance with the contract.
Based on the evidence before the court, including the March 26 transcript of the proceedings before the OCUA, the court is of the view that Agorganic has failed to prove that the OCUA abused its discretion by concluding that Spectraserv has the capacity to fulfill its contract. As noted, the court must give deference to that decision. Additionally, the OCUA is protected by its specifications which require Spectraserv to post a performance bond for the faithful implementation of the contract. Finally, the OCUA has the right to terminate the contract at any time if Spectraserv is unable to beneficially reuse the sludge in accordance with the contract.

B. The OCUA's Duty to Investigate Spectraserv's Capacity to Perform.

The plaintiff next argues that the OCUA should have exercised greater diligence by independently examining the feasibility of Spectraserv's disposal plan. Agorganic asserts that the OCUA was obligated to conduct a hearing to determine *390 the bidder's responsibility. It relies upon Poling v. Roman, 86 N.J. Super. 484, 207 A.2d 219 (Law Div. 1965), in which the court held that the term "responsibility" implicates an inquiry into the bidder's ability to perform. Clearly, the ability to perform is of the very essence of any contract for public work. Donald F. Begraft, Inc. v. Franklin Bd. of Educ., 133 N.J. Super. 415, 417, 337 A.2d 52 (App.Div. 1975).
In the first place, Spectraserv's "responsibility" was the focus of the March 26 hearing. At issue was Spectraserv's ability to provide sites at which the sludge would be recycled. The OCUA was satisfied that Spectraserv could perform.
Furthermore, the line of cases represented by the Poling decision, which require a responsibility hearing, are inapposite. The so-called "responsibility hearings" are generated by the requirement that all contracts which necessitate public advertisement for bids shall be awarded to the "lowest responsible bidder." N.J.S.A. 40A:11-6.1. Obviously, under those circumstances, a hearing must be held if there is a challenge to the bidder's competency. Suburban Restoration Co., Inc. v. Jersey City Hous. Auth., 179 N.J. Super. 479, 482, 432 A.2d 564 (App.Div. 1981); Palamar Const., Inc. v. Pennsauken Tp., 196 N.J. Super. at 247, 482 A.2d 174. The statutory mandate is not applicable in this case because the OCUA was not obligated to award the contract to the lowest responsible bidder nor was it required to solicit formal bids in the first instance.
In any event, even though the OCUA was not required to hold a responsibility hearing within the terms of the statute, the court nonetheless concludes that the March 26 hearing provided a fair and complete forum in which Spectraserv's ability to perform was addressed.

C. The OCUA's Obligation to Conduct Negotiations Fairly.

Next, the plaintiff contends that the OCUA failed to conduct the negotiations in an evenhanded manner. The uncontradicted testimony establishes that a negotiation session was *391 held with representatives of Spectraserv on March 5. At that meeting the OCUA advised Spectraserv of its desire to beneficially reuse the sludge. Spectraserv adhered to its original bid price for the Northern facility and continued to propose to incinerate the sludge from that plant. As to the Central and Southern facilities, Spectraserv lowered its price and agreed to beneficially reuse the sludge. On March 11, the OCUA met with Agorganic and again recited its desire to beneficially reuse the sludge. Agorganic maintained both its price and method of disposal for the Southern and Central plants. However, it lowered its price on the Northern plant and agreed to beneficially reuse the sludge from that site.
Richard Kunz, the Director of Technical Services for the OCUA, testified that as of March 11, Agorganic was the low bidder for the Northern facility while Spectraserv was the low bidder for the Central and Southern facilities. On the same day, Kunz met with the OCUA counsel and another staff member. They decided that Spectraserv had submitted the lowest overall cost bid. Kunz testified that at the conclusion of that meeting, he called Spectraserv and asked it to confirm the March 5 proposal, which it did by letter of the same date. The OCUA then scheduled a public meeting for March 16 to award the contract. As of March 16, the OCUA had not notified Agorganic of its intention to give the contract to Spectraserv.
Due to a failure to comply with the notice requirements of the Open Public Meetings Act [N.J.S.A. 10:4-6 et seq.], the March 16 meeting was cancelled. On March 17, Agorganic submitted a letter to the OCUA objecting to the anticipated award of the contract and submitting a revised proposal lower in cost than Spectraserv's bid. Upon receiving the letter, Kunz called Spectraserv and requested a response to Agorganic's allegations concerning certain legal issues and Spectraserv's capacity to recycle. Agorganic's counsel wrote another letter on March 25, supplementing those allegations. As discussed earlier, the OCUA held a meeting on March 26, at which time *392 both sides were given a full opportunity to be heard regarding Agorganic's charges.
The foregoing recitation of the negotiation process is essentially undisputed. Agorganic, however, objects to two aspects of the negotiation procedure. First, it is alleged that Spectraserv was given a second chance to modify its proposal whereas Agorganic was not permitted to do so. Second, Agorganic charges that the OCUA was obligated to inform it that negotiations would be terminated on a specified date. In effect, Agorganic claims that it was denied the opportunity to offer its best price.
The suggestion that Spectraserv was permitted to modify its proposal made at the March 5 meeting arises not from the trial record or from Agorganic's post-trial brief, but rather from a statement contained in Spectraserv's post-trial brief. In referring to the telephone call made by the OCUA's representative to Spectraserv on March 11, Spectraserv's brief contains the following language:
OCUA then contacted Spectraserv and without revealing the prices that Agorganic had given to the OCUA, negotiated with the other low bidder. It asked for and received Spectraserv's best price: a proposed adjusted price from the Central and Southern facilities below the bid price of Agorganic based upon beneficial reuse of that sludge, ....
The implication of the brief is that on March 11, Spectraserv was given an opportunity to lower the price which was discussed at the March 5 meeting. That suggestion conflicts with the trial testimony and the briefs submitted by the other parties, including Spectraserv's pre-trial brief.
While the statement created suspicion, the court should be bound by the record. That record was made principally through representatives of the OCUA called as witnesses by the plaintiff and by a representative of Spectraserv, called as its witness, all of whom established the chronology of events. The evidence supports the conclusion that Spectraserv was not given a second opportunity to change its proposal. Agorganic *393 cannot seize upon an inadvertent statement in Spectraserv's brief as proof to the contrary.
Alternatively, Agorganic argues that the OCUA acted arbitrarily in cutting off the negotiations as of March 11. In response, the OCUA contends that each bidder was given an equal opportunity to negotiate. The OCUA asserts that a decision had to be made prior to the March 15 expiration of the existing contract. It also contends that the contract would have been awarded on March 16, but for the cancellation of the meeting due to noncompliance with the Open Public Meetings Act. Thus, the fact that the OCUA received a lower proposal from Agorganic on March 17, should not alter its obligation to award the contract to Spectraserv absent a showing that the OCUA was acting in bad faith or out of improper motive.
While N.J.S.A. 40A:11-5, allows for the negotiation of contracts in a variety of situations, it does not establish the method of negotiation. The court in Interstate Waste Removal Co. v. Commissioners of Bordentown, 140 N.J. Super. 65, 355 A.2d 197 (App.Div. 1976), addressed the accountability of a public agency utilizing the right to negotiate a contract in lieu of formal bids. The court said:
We do not construe the statutory language in the manner suggested by the appellant. The term "negotiate" is not used as a word of art designating any particular method of arriving at a contract price. It is simply an alternative method distinguishable from rigid bidding procedures....
Where negotiation is permissible under the statute the municipality has great flexibility and may use any conceivable business method to accomplish the salutary goal of obtaining the lowest available price. There is no magic or uniform procedure which must be utilized. So long as it is structured to accomplish the purpose of the legislation, namely, to achieve the lowest available price from a responsible bidder, and the former bidders are given an opportunity to participate, the municipal officials have fully complied with their statutory duty. [Id. at 70, 355 A.2d 197].
The court finds that the bidders were given a reasonable opportunity to participate and that, allowing for the flexibility which the OCUA must be permitted, its conduct was not arbitrary under the circumstances. The evidence establishes that the OCUA was attempting to finalize its negotiations in *394 the face of a March 15 deadline. There is also undisputed testimony that as of March 11, each bidder had been given a chance to modify its formal proposal through negotiation. It is well known that negotiations can ping-pong indefinitely if some specific deadline is not chosen to terminate them. Nothing requires that a formal cut off date be announced. The OCUA has a right to determine, in a reasonable manner, when enough is enough.

D. The OCUA's Obligation to Award a Contract in the Best Interests of the rate payers.

The plaintiff stresses and both defendants concede, that the OCUA is obligated to award a contract which it determines would best serve the interests of the rate payers. A.C. Schultes & Sons v. Haddon Tp., 8 N.J. 103, 107-08, 83 A.2d 896 (1951). As mentioned earlier, bidding statutes are for the benefit of the taxpayers and, therefore, should be construed primarily with reference to the public good. Terminal Constr. Corp. v. Atlantic County Sewerage Auth., 67 N.J. at 409-10, 341 A.2d 327. The parties also agree that when the bidding agency is free to negotiate a contract, an award to a higher bidder will not be set aside except upon a showing of an abuse of discretion or fraud. F.S.D. Industries, Inc. v. Paterson Bd. of Educ., 166 N.J. Super. 330, 334-35, 399 A.2d 1021 (App.Div. 1979).
Agorganic contends that the OCUA would have saved $248,000 if it had accepted Agorganic's proposal for all three facilities. The OCUA counters that Spectraserv's package deal was more cost effective on a total cost analysis. Several considerations influenced the OCUA's decision.
First, the OCUA observes that the specifications allowed the bidder to base its proposal on accepting the sludge in various degrees of liquidity. It could have been delivered with 8% solids (known as "thickened" sludge) or in a 16% or 20% dewatered state (known as "cake" sludge). The OCUA asserts *395 that the process of producing the cake sludge from the thickened sludge had to be evaluated in light of the additional costs involved, the potential odor problems and a "somewhat deficient" storage capacity at the OCUA's site. Agorganic replies that it would be absurd to require rate payers to absorb an additional $248,000 merely because it would be "easier" for the OCUA to have the sludge removed by direct pumping rather than by dewatering it to a more solid state before delivering it to Agorganic. However, no evidence was presented to establish the cost of dewatering, odor control or the provision of adequate storage. Furthermore, Agorganic did not demonstrate what other savings may have been achieved by directly delivering the thickened sludge as opposed to the cake sludge.
Second, the extent of any savings could not be quantified since the contract contemplated that the successful bidder would receive only the excess sludge which the OCUA could not process. Therefore, it was impossible to calculate precisely the amount of money to be saved by the OCUA since it could not predict how much sludge it would recycle and how much it would release to the contractor.
Additionally, the OCUA Director of Technical Services testified that the OCUA had prior dealings with Spectraserv and believed it was a responsible and reputable company. The OCUA was willing to accept Spectraserv's representations of their ability to beneficially reuse the sludge from the Central and Southern plants. Indeed, the OCUA accepted the background, experience and representations of both bidders. The OCUA also understood that both bidders knew that failure to dispose of the sludge in accordance with their representations would violate the contract. Furthermore, the OCUA emphasizes that its Commissioners had a full opportunity to hear and analyze the respective arguments of both parties and to consider the recommendations of its staff.
Put simply, the plaintiff's charge that the OCUA failed to protect the best interests of its rate payers is not supported by *396 the proofs. Given that the OCUA's acts are entitled to deference, the court must find that the OCUA acted reasonably in concluding that the award to Spectraserv adequately safeguarded the public interest.
Having determined that the contract was within the scope of the statutory exception to the Local Public Contracts Law and that the OCUA properly applied that exception, the decision to award the contract to Spectraserv is hereby affirmed and the existing restraint is dissolved.
NOTES
[1] The term "beneficial reuse" is frequently employed interchangeably with the term "recycle" and will be so used in this opinion.
[2] There is some question whether the March 11 contact between the OCUA and Spectraserv was limited to confirming the March 5 quotation or whether Spectraserv was given a chance to make a revised offer. The confusion was created by the factual recitations in Spectraserv's post-trial brief. This issue will be more fully explored later in reference to Agorganic's claim that the OCUA acted unfairly in the negotiation process.
[3] It is to be noted that neither during the negotiations nor at trial did Agorganic claim that it understood the OCUA required complete recycling as a condition to negotiations.