798 A.2d 681 (2002)
351 N.J. Super. 440
ENTECH CORPORATION, a New York Corporation, Plaintiff,
v.
CITY OF NEWARK, Defendant.
Superior Court of New Jersey, Law Division.
Decided January 9, 2002.
*684 Edward S. Kiel, Hackensack, for plaintiff, (Cole Schotz, Meisel, Forman & Leonard, attorneys).
William J. Schwartz, First Assistant Corporation Counsel, for defendant, City of Newark.
Mark L. Fleder and Damon McDougal, Roseland, for Spiniello, intervenor-defendant, (Connell Foley, LLP, attorneys). *682
*683 JACOBSON, J.S.C.

INTRODUCTION
On November 16, 2001, Entech Corporation filed an Order To Show Cause and a Verified Complaint in Lieu of Prerogative Writs against the City of Newark, growing out of the City's selection of Spiniello as the low bidder on Brick Sewer Rehabilitation, Phase III/IV (G) Sewer Rehabilitation Contract No. 08-WS2000. The City notified Entech on October 12, 2001, that Entech's bidalthough apparently the lowest receivedhad not been accepted because it was non-conforming. Entech admittedly had submitted a bid for the in-place rehabilitation of approximately 5800 linear feet of brick combined sanitary/storm sewers using shotcrete or gunite when the bid specifications called for the use of cured-in-place pipe lining or *685 Fiberglass Reinforced Plastic segmental sewer lining, also known as "channeline". Shotcrete had been used on other sewer rehabilitation projects in Newark and is less expensive than the two other methods selected by Newark for this bid. Although Entech had challenged the bid specification that excluded shotcrete as an alternative method of sewer rehabilitation for the project under N.J.S.A. 40A:11-13(e) prior to the bid opening, Newark had rejected the challenge without explanation. After the bid award, Entech filed this Order to Show Cause seeking to enjoin Newark from entering into a contract with the winning bidder, Spiniello, which had bid more than $1,000,000 more than Entech using the cured-in-place technology.

STATEMENT OF FACTS
The City of Newark is in the process of implementing a major sewer rehabilitation project funded in part by the federal government. Newark's engineer for Phase III/IV of the Brick Sewer Rehabilitation project is Camp Dresser & McKee. Entech had successfully bid on at least one sewer rehabilitation contract for Newark using shotcrete, which is a mortar or concrete coating that is sprayed onto the inside surface of sewer pipes. Shotcrete is also referred to as gunite. Among the issues involved in this case is whether Newark properly excluded shotcrete as an acceptable method of sewer rehabilitation for contract 08.
In February 2001, Entech became concerned that bid openings on contracts 03, 04, 05 and 06 of Phase III/IV of Newark's Brick Sewer Rehabilitation project excluded shotcrete as a rehabilitation method, and wrote to Camp Dresser & McKee (CDM) to request that shotcrete be considered as an alternate method to the technologies specified in the bid documents. CDM responded on February 19, 2001, stating that while shotcrete had been considered as a rehabilitation technique for some of the sewer rehabilitation contracts in the past, it would not be used for contracts 03, 04, 05 and 06, but might be used for contract 09. No explanation for this statement was provided. On February 23, 2001, Entech wrote again to CDM, this time to request the procedures for filing a bid protest with Newark concerning the bid specifications for the four contracts under discussion. Entech sent a second letter on the same date, asking again for an explanation from CDM for the exclusion of shotcrete from the rehabilitation methods acceptable for the four contracts. Entech sounded what has become its recurring theme in that letter, arguing that shotcrete had historically been accepted by Newark for sewer rehabilitation projects, was more cost effective than the other methods chosen for those contracts, and should be reconsidered as a rehabilitation method for the brick sewer rehabilitation work in Newark. There is no written response from CDM to Entech's letter in the record. Nor does the record address the award of bids for contracts 03, 04, 05 and 06.
In September 2001, Newark solicited bids for contract 08 of the Phase III/IV Sewer Rehabilitation Program and limited the rehabilitation techniques to cured-in-place piping and a fiberglass lining system known as channeline. Prior to this solicitation, the plans and specifications for contract 08 had been reviewed and approved by the United States Environmental Protection Agency as being in conformance with applicable federal regulations. Bids were to be submitted by September 26, 2001. Entech reviewed the bid documents and wrote to CDM on September 11, 2001, proposing to respond to the bid request utilizing the shotcrete method. Entech noted in the September 11 letter that *686 CDM had led Entech to believe that the earlier referenced contracts excluded shotcrete because of the smaller size of the sewers involved and that shotcrete would be acceptable for larger sewers, such as the ones included in contract 08. A follow-up letter from Entech to CDM of September 14, 2001, requested the design basis and method of analysis used to design the project.
On September 18, 2001, CDM responded to Entech, stating merely that a bid proposing gunite (or shotcrete) would be deemed unresponsive. No explanation was given as to why shotcrete had been excluded as a rehabilitation technique for the large sewers included in contract 08. In a letter of September 21, 2001, CDM reiterated that a bid utilizing gunite would be non-responsive given the bid specifications for contract 08. CDM also refused to provide Entech with the design basis for the contract, claiming that this material was not necessary for Entech to bid on the contract. Also on September 21, 2001, counsel for Entech challenged the exclusion of gunite or shotcrete from the bidding specifications for contract 08 under N.J.S.A. 40A:11-13(e). By letter dated September 24, 2001, CDM acknowledged receipt of the challenge and stated simply that "Please be advised that the City intends to receive bids on the project as designed on September 26, 2001." No explanation for the exclusion of shotcrete as a rehabilitation method for contract 08 was provided.
Entech then proceeded to submit a bid for contract 08 using shotcrete or gunite, totalling $1,590,999.00. By letter dated October 12, 2001, Philip A. LiVecchi, Director of the Newark Department of Water and Sewer Utilities, notified Entech that Entech's "alternate bid proposal ... cannot be accepted." Apparently, Newark awarded the bid to Spiniello, one of three responsive bidders, with a bid utilizing cured-in-place piping at a total cost of $2,687,920.00. Entech did not file a bid protest with Newark at this time, despite having preserved its right to challenge the bid specifications after the receipt of bids by filing a bid specification challenge under N.J.S.A. 40A:11-13(e) at least three days prior to the opening of bids. Rather, approximately one month later, on November 16, 2001, Entech filed an Order to Show Cause and Verified Complaint in Lieu of Prerogative Writs, naming only the City as defendant, and seeking an injunction against the award of the 08 contract to any entity other than Entech. Entech also sought orders declaring gunite an acceptable method of rehabilitation for the work required in contract 08, declaring Entech the lowest responsive bidder for the project, and an order compelling the City of Newark to enter into a contract with Entech for the amount of Entech's bid proposal.
This court scheduled the matter for oral argument by telephone on November 30, 2001, to determine if any preliminary relief was required on an emergent basis. After being assured that the contract would not be awarded until after further consideration of Entech's lawsuit by the court, the court directed the City to submit its reasons for requiring cured-in-place pipe lining or fiberglass sewer lining instead of shotcrete for contract 08 by December 5, 2001 and scheduled oral argument in person on December 7, 2001. In response to that request, Newark lodged with the court CDM's Design Memorandum for Phase III/IV Brick Sewer Rehabilitation Project, dated September 2000, and a Design Memorandum Supplement addressing "Use of Shotcrete as a Rehabilitation Alternative" dated May 2001. Neither of these documents had been provided to Entech previously despite Entech's requests for an explanation concerning the exclusion *687 of shotcrete as a design alternative from contract 08 and other sewer rehabilitation contracts, and despite the challenge Entech had filed to the bid specifications for contract 08 under N.J.S.A. 40A:11-13(e).
The September 2000 report detailed the challenges facing Newark in implementing a comprehensive sewer rehabilitation project. The City's sewer system is not only old, having segments constructed as far back as the 1800's, but was constructed of various materials including clay, plastic, concrete, iron, stone, and brick. Diameters of the sewer pipes range from eight inches to 120 inches and include various shapes such as circular, elliptical, and horseshoe. Approximately 68 miles of Newark's sewer system are constructed of brick. Repair and rehabilitation of the brick sewers commenced in 1990, with repair methods including sewer replacement, cured-in-place pipe lining, and gunite lining. Contract 08 is part of the combined Phase III/IV of the brick sewer rehabilitation project which addresses repair and replacement needs for much of the remaining 40 miles of brick sewers not covered in the first two phases of the project.
To design the project, internal videotape inspections of the sewers were performed to determine their condition. Videotapes for each contract were made available in advance to interested bidders. The engineers then applied a structural rating system and ranking criteria based upon the risk of collapse leading to a prioritization of the repair work. Various repair methods and associated cost estimates were then analyzed. CDM recognized that the cost of the project exceeded available funding, and strove in the report "to provide greater assurance that available funding is used prudently" and to carefully evaluate available rehabilitation alternatives to ensure that the City utilizes "the most appropriate and cost-effective technologies."
Section 3 of the report addressed alternate rehabilitation methods in detail, concluding that trenchless technologies that minimized surface disruptions were the most appropriate and cost-effective for these phases of the brick sewer rehabilitation project. The main technologies considered were pipe coating and pipe lining. CDM discussed structural pipe coating with reinforced gunite/shotcrete, which is a mortar or concrete coating that is applied through a hose at a high velocity to the surfaces of the existing pipelines. Steel wire or mesh reinforcement is used in conjunction with the coating to limit cracking and provide structural strength. CDM noted in the report that gunite had been successfully used by Newark in the past and would be considered for use in Phases III/IV of the brick sewer repair project. CDM also analyzed pipe linings, including in its definition all rehabilitation techniques where smaller diameter pipes are installed inside of existing sewer pipes. The report reviewed many different types of lining systems, including cured-in-place, close-fit, spiral wound, segmental and composite.
Cured-in-place pipe (CIPP) lining involves the insertion of a resin-impregnated felt or fabric liner into the existing pipeline and then thermal activation or curing the liner to make it rigid. The CIPP liner takes the shape of the host pipeline without a significant loss in hydraulic capacity and avoids the need for grouting. CDM noted that "CIPP liners are one of the most common rehabilitation techniques in use today because of their rapid installation and their applicability to a wide range of pipe sizes and shapes," and concluded that "CIPP liners have been used successfully within the Newark sewer system in the past and will likely be used extensively *688 on this project." CDM rejected the use of close-fitting pipe linings for the project, but continued to consider spiral wound pipe lining, segmental lining with fiberglass and other materials, and a proprietary composite pipe lining system.
In evaluating the advantages and disadvantages of the various trenchless technologies, CDM noted that the "successful installation of a high quality gunite liner is heavily dependent on the skill and experience of the nozzleman, gun operator and job superintendent," concluding that if gunite were used in the project, stringent experience and certification requirements would be mandated. CDM also noted that the physical properties of gunite are very similar to concrete, concluding that this similarly made it more susceptible to corrosion than cured resin lining and less resistant to abrasion than CIPP liners or fiberglass reinforced plastic (FRP) pipe. In assessing the advantages and disadvantages of shotcrete, CDM noted that it was the most economical method for large, man-entry sewers, but that its "life expectancy and long-term stability" were questionable, ultimately concluding that, "Its use should be considered if it is deemed to be the only cost effective alternative for lining a particular sewer segment."
The CDM report gave very favorable consideration to CIPP lining systems, largely because of their resistance to abrasion and corrosion and their design life of a minimum of fifty years. CDM also observed that since CIPP is a commonly used rehabilitation technique, many contractors, including several local contractors, have the capability to install CIPP liners. According to CDM, CIPP liners can be installed quickly, minimizing surface disruptions, do not need grouting, can accommodate various shapes and idiosyncrasies of existing sewer lines, provide a smooth, seamless surface that is resistant to corrosion and abrasion, and constitute the "benchmark" against which other sewer liners are compared. CDM thus anticipated that the liners would be used extensively in the project.
CDM also examined the channeline sewer lining system that uses fiberglass reinforced plastic ("FRP") to construct a lining within existing sewers. FRP is constructed of two layers of chopped strand glass fiber consolidated with a polyester resin and needs grouting to fill the spaces between the liner and the existing pipeline. Apparently, channeline sewers are generally cost effective only when they can be installed in man-entry sewers. CDM noted that FRP pipe is extremely strong and comes with a 50-year warranty, but has not been used extensively in the United States, although it has a significant track record in Europe and some use in Canada. CDM concluded, therefore, that the channeline FRP system should be considered for use on at least one project.
Section 5 of the report analyzed recommended rehabilitation methods for each sewer segment, based on the pipe sizes involved. CDM concluded that neither gunite nor channeline was appropriate for non man-entry sewers, and also concluded that CIPP liners would not be recommended due to high cost for pipes with dimensions of 80 or more inches. Because gunite is dependent on the quality of application, CDM restricted its use to man-entry sewers with dimensions of at least 60 inches. Channeline was also anticipated to be appropriate only for large sewers, although CDM recommended that it not be used extensively until there was one satisfactory and economical installation of this technology in Newark. CDM specifically addressed the issue of bidding alternate technologies, concluding that a prerequisite to such bidding must be a determination that each method provided *689 comparable levels of rehabilitation. CDM anticipated that CIPP and channeline could be bid against each other in most cases because they provided full structural rehabilitation with similar design life expectancy and physical characteristics. CDM observed, however, that where structural gunite was allowed, neither CIPP nor channeline would be cost competitive. As of September 2000, CDM anticipated that gunite would be the primary technology employed for sewers greater than 60 inches in diameter, although CIPP and FRP might be considered if they proved cost competitive. CDM also recommended that the work be divided into 12 separate contracts based on priority, sewer size, and location.
After bids were received on the first several contracts in Phase III/IV, and favorable prices for CIPP were obtained through open competition, CDM and Newark determined to reevaluate the use of shotcrete as a viable rehabilitation method for the largest diameter sewers included in the program. CDM prepared a Design Memorandum Supplement dated May 2001 addressing this issue and concluding that shotcrete should no longer be considered as a design alternative for large diameter sewers. The CDM May 2001 report noted that CIPP and channeline provided flexible, stand-alone pipes within existing sewers that did not require a bond between the lining and the existing sewer. Such liners are apparently referred to as "Type II", liners based on these characteristics. On the other hand, shotcrete linings are applied to existing sewers and create a composite structure in which the lining is bonded to the existing sewers. Indeed, the existing sewers must not be fully deteriorated and are utilized to carry compressive forces. Such liners are known as "Type I" liners. While shotcrete can be applied in sufficient thickness to function as a Type II lining, CDM determined that the thickness of shotcrete lining needed to achieve Type II function for the Newark project would be such as to significantly and unacceptably reduce the hydraulic capacity of the pipes. Based on what they determined to be the superior characteristics of CIPP and channeline Type II liners, and the favorable prices received in early Phase III/IV bids for CIPP in particular, Newark and CDM decided to require CIPP or channeline for almost all of the remaining brick sewer rehabilitation work in Newark. As noted in the May 2001 report, "With the dramatic decrease in CIPP bid prices and the advent of alternative lining methods such as FRP, there is no longer a need to sacrifice hydraulic capacity and structural rehabilitation for cost. As such, shotcrete linings are not recommended for use on Phase III/IV of the Program."
While these reports explained the evolving philosophy of CDM and Newark regarding the use of gunite in the brick sewer rehabilitation project, the court directed Newark to provide specific reasons for the exclusion of shotcrete in contract 08. On December 14, 2001, therefore, Newark submitted the certification of Paul Mourt, P.E., the former project manager for CDM on the Brick Sewer Rehabilitation project.
Mr. Mourt noted that both the September 2000 Design report and the May 2001 supplement had been prepared under his direction. As evidenced in these reports, CDM spent much time and effort in reviewing viable rehabilitation methods for the project. While shotcrete had been considered as a rehabilitation technique for the largest diameter sewers in 2000, experience with bidding the early contracts caused CDM to re-evaluate this recommendation in the May 2001 report. Mr. Mourt essentially reiterated the conclusions of the May 2001 report by stating *690 that shotcrete was excluded from further consideration for most of the Phase III/IV contracts due to the reduction in hydraulic capacity associated with the technology, the related loss of storage capacity, and the deterioration of the concrete. He stated that, "While admixtures or supplemental linings can be utilized to provide a greater resistance to corrosion, during the report and design phase of the project we were not convinced that any such project would provide a design life equivalent to polyester and fiberglass finished products such as CIP and FRP." Mr. Mourt noted that while shotcrete had been approved for use in contract 07 of the project, that work involved an open cut installation of a box culvert in which a new chamber had to be added to an existing brick arch sewer that had not deteriorated. He asserted further that the sole purpose of the shotcrete lining in contract 07 was to permit the construction of a new chamber and was not intended to achieve a structural rehabilitation of the existing brick sewer. Finally, Mr. Mourt concluded that shotcrete should not be used in contract 08 because it would not provide the kind of structural rehabilitation desired by Newark and achievable with the use of CIPP or channeline.
Even after receiving and reviewing the CDM reports and Mr. Mourt's certification, Entech continues to insist that Newark has not provided "any credible analysis for the rejection of gunite for Contract 08." Moreover, Entech questions the circumstances surrounding the rejection of shotcrete, claiming that the May 2001 report is suspect because it post-dated release of the specifications for the 08 contract. Entech also questions Newark's motives altogether based on a claim that the City improperly favored Insituform Technologies, Inc. ("ITT"), a leading manufacturer of CIPP, by excluding shotcrete as a rehabilitation alternative on contract 08.
Entech bases its claim of favoritism on an article from a trade publication called "Trenchless Technology" which reported the presence of Newark officials at the ceremonial opening of trading of ITT stock at the NASDAQ Stock MarketSite in Times Square, New York City. According to the article, ITT's vice-president is quoted as saying that he was pleased with the turnout of Newark personnel because "Newark will be having a lot of trenchless pipeline rehab work in the future, and it was great to have them participate in this exciting event." Notably, however, ITT was an unsuccessful bidder on contract 08 which, as recounted above, was awarded to the lowest responsive bidder, Spiniello. Although not named as a defendant in the Verified Complaint, Spiniello appeared at oral argument on December 7, 2001 and was permitted to present argument. Since its interests are at stake in this litigation, Spiniello is an indispensable party and will be treated as a defendant-intervenor.

LEGAL PRINCIPLES
Entech has filed an Order to Show Cause in lieu of prerogative writs to restrain the City of Newark from awarding contract 08 to any bidder but Entech. In considering requests for injunctive relief, the court must consider whether irreparable harm will be prevented by the issuance of the relief, whether the claim rests on a settled legal right, whether there are any controverted material facts, whether plaintiff has made a showing of reasonable probability of ultimate success on the merits, the relative hardship to the parties in granting or denying the relief requested, and the public interest. Crowe v. DeGioia, 90 N.J. 126, 133-134, 447 A.2d 173 (1982).
This case involves Entech's challenge of Newark's bid specifications and subsequent rejection of an apparently non-conforming bid submitted by Entech. *691 Newark awarded this bid to Spiniello, the lowest responsible bidder. Notably, "[a] reviewing court cannot overturn the decision of a municipal body unless it finds that the decision was arbitrary, capricious and unreasonable." Palamar Construction, Inc. v. Township of Pennsauken, 196 N.J.Super. 241, 250, 482 A.2d 174 (App. Div.1983), citing Kramer v. Sea Girt Bd. Of Adj., 45 N.J. 268, 212 A.2d 153 (1965). Further, there must be a clear abuse of discretion by the municipality in order for such a decision to be overturned by a court. Id., Serenity Contracting Group, Inc. v. Borough of Fort Lee, 306 N.J.Super. 151, 157, 703 A.2d 352 (App.Div.1997). While the court must not substitute its own judgment for that of the municipality, the judicial policy in construing and applying the local public contracts law is "to curtail the discretion of local authorities by demanding strict compliance with public bidding guidelines." Pucillo v. Mayor and Council of Borough of New Milford, 73 N.J. 349, 356, 375 A.2d 602 (1977). This policy furthers the public interest by insisting on close scrutiny of public contracts to ensure proper expenditures of public funds.
Since the purpose of New Jersey's local public contracts laws is to ensure that bidding is fair and free from fraud, such statutes "should be rigidly enforced by the courts to promote that objective." Skakel v. Township of North Bergen, 37 N.J. 369, 378, 181 A.2d 473 (1962). Indeed, the purpose of all public bidding laws is "to secure for the taxpayers the benefits of competition and to promote the honesty and integrity of the bidders and the system." Protest of Award of On-Line Games Production, 279 N.J.Super. 566, 589, 653 A.2d 1145 (App.Div.1995). These statutes "are for the benefit of taxpayers and are therefore construed as nearly as possible with sole reference to public good." Id., citing, Keyes Martin & Co. v. Director, Div. of Purchase and Property, 99 N.J. 244, 491 A.2d 1236 (1985). As such, the bidding process must not be used in such a way as to favor one bidder or allow for corruption. Terminal Construction Corp. v. Atlantic County Sewerage Authority, 67 N.J. 403, 410, 341 A.2d 327 (1975). Rather, the aim of the law is to promote "the benefits of unfettered competition." Ibid. The object of public bidding is not to protect the individual interests of the bidders, but rather to promote the public interest by "inviting competition in which all bidders are placed on an equal basis...." Tp. of River Vale v. R.J. Longo Const. Co., 127 N.J.Super. 207, 215, 316 A.2d 737 (Law Div.1974). See also 426 Bloomfield Corp. v. Newark, 262 N.J.Super. 384, 387, 621 A.2d 59 (App.Div. 1993).
Under the Local Public Contracts Law, contracts generally must be awarded to the lowest bidder who submits a bid conforming to the specifications. See Township of Hillside v. Sternin, 25 N.J. 317, 324, 136 A.2d 265 (1957). N.J.S.A. 40A:11-6.1 now provides that for all contracts covered by this provision "the contracting agent shall award the contract after soliciting at least two competitive quotations if practicable. The award shall be made to the vendor whose response is most advantageous, price and other factors considered." To be accepted, bid proposals must not materially deviate from the specifications set forth by the contracting agency. Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 650 A.2d 748 (1994). Indeed, "material conditions contained in bidding specifications may not be waived." Terminal Const. Corp., supra, 67 N.J. at 411, 341 A.2d 327. In fact, "where a party does not materially respond to the bid specifications he cannot be classified as a bidder at all, since the *692 specifications are mandatory and jurisdictional." George Harms Const. Co. v. Borough of Lincoln Park, 161 N.J.Super. 367, 374, 391 A.2d 960 (Law Div.1978). Consequently, "a non-conforming bid is no bid at all." On-Line Games Production, supra, 279 N.J.Super. at 595, 653 A.2d 1145.
N.J.S.A. 40A:11-13 requires that specifications for the provision of goods and services be drafted "to encourage free, open and competitive bidding." This statutory section further limits a municipality's discretion by preventing the adoption of any specification which knowingly would qualify only one bidder. Under the local public contracts law, therefore, the court must "balance the right of the bidding agency to draw detailed and exacting specifications against the potential for fraud, extravagance or favoritism in order to ensure a level playing field for all potential bidders." Utilimatic, Inc. v. Brick Township M.U.A., 267 N.J.Super. 139, 145, 630 A.2d 862 (Law Div.1993). The local public contracts statute does not require bid specifications to be so general as to force localities to use lower quality goods, but it does seek to foster competition through adoption of pro-competitive contract requirements. See generally Bodies by Lembo v. Middlesex County, 286 N.J.Super. 298, 669 A.2d 254 (App.Div. 1996).
Where a bidder wants to challenge bid specifications, N.J.S.A. 40A:11-13(e) provides that:
Any prospective bidder who wishes to challenge a bid specification shall file such challenges in writing with the contracting agent no less than three business days prior to the opening of the bids. Challenges filed after that time shall be considered void and having no impact on the contracting unit or the award of a contract.
This statutory provision is consistent with the judicial holding that unsuccessful bidders who bid on a contract without first objecting to the specifications lack standing to "challenge the award of the contract to a rival bidder or to attack allegedly illegal specifications." Waszen v. Atlantic City, 1 N.J. 272, 276, 63 A.2d 255 (1949). "The rationale of such a holding is that one cannot endeavor to take advantage of a contract to be awarded under illegal specifications and then, when unsuccessful, seek to have the contract set aside." Id. However, where an action challenging bid specifications is made prior to the bid submission date, that party has standing to challenge the specifications. Sevell's Auto Body Co., Inc. v. N.J. Highway Authority, 306 N.J.Super. 357, 369-370, 703 A.2d 948 (App.Div.1997). In 1996, the New Jersey legislature amended the Local Public Contracts Law to provide that a challenge to a bid specification be brought at least three days prior to the opening of the bids. N.J.S.A. 40A:11-13(e). No published decision has yet been rendered interpreting and applying this statutory provision.
The obvious purpose of N.J.S.A. 40A:11-13(e) is to require challenges to bid specifications to be presented to contracting authorities at least three days before the opening of the bids. Such a requirement puts the public entity on notice prior to the bid opening that a potential bidder is challenging the specifications so that the entity then has an opportunity to re-evaluate the specifications and either quickly respond to the challenge before the opening, postpone the bid opening to address the challenge and perhaps change the specifications, or to proceed with the opening without addressing the challenge with the knowledge that the bid award may be subject to a post-opening challenge. The provision thus permits a potential bidder to preserve its right to challenge the specificationsa right that otherwise would be *693 lost if a timely challenge was not lodged. The provision also gives the public entity the assurance that if no challenge to the specifications is made within the statutory time frame, the specifications cannot later be attacked. This interpretation of the statutory provision is supported by the legislature's explicit statement that any challenges filed after the three-day period prior to bid opening are void and will not affect the award of the contract.
Entech argues that N.J.S.A. 40A:11-13(e) entitles it to a hearing on its specification challenge before the bid is awarded. However, the extremely short period of time prior to the bid opening provided in the statute and the flexibility needed by contracting entities to achieve public contracting goals in the public interest precludes such an interpretation. Rather, a common sense interpretation of the statute allows it to serve a notice and preservation of rights function, as noted above, although the public entity certainly could opt to address the challenge before the bid opening. Moreover, nothing in the explicit language of the statute requires a hearing on the challenge, and certainly does not require a trial-type hearing. This court holds, therefore, that N.J.S.A. 40A:11-13(e) affords potential bidders the right to preserve a bid specification challenge which can then be perfected after the bid opening, and affords the contracting entity the flexibility to address the challenge before the opening or defer it until after the opening with the knowledge that the bid award may then be brought into question. This interpretation gives the public entity the kind of flexibility it needs to adapt to the broad range of circumstances that may arise in the public contracting arena and best serves the public interest. See Agorganic, Inc. v. Ocean County Utilities Authority, 259 N.J.Super. 377, 390-391, 613 A.2d 511 (Law Div.1992).
In neither case, howevereither in addressing a bid specification challenge before the opening or after the opening upon notice of a challenge under N.J.S.A. 40A:11-13(e)is a trial-type hearing required. For even in situations involving post-opening bidder responsiveness and bidder responsibility challenges, it is clear that an adequate "hearing" is one in which the protester and other interested parties are given an opportunity to be heard and obtain a decision explaining the contracting entity's actions. This hearing may be quasi-legislative in nature. See Agorganic, supra, 259 N.J.Super. at 383 and 390, 613 A.2d 511, in which bidders were invited to present detailed analyses of their objections at a public meeting of the contracting entity, following which the entity adopted a resolution awarding the contract. The Agorganic Court specifically concluded that this "hearing provided a fair and complete forum in which [the winning bidder's] ability to perform was addressed." Id. at 390, 613 A.2d 511. See also Palamar Construction, Inc. v. Township of Pennsauken, 196 N.J.Super. 241, 244-247, 482 A.2d 174 (App.Div.1983), in which a bid protest hearing was conducted by the Township Committee on two separate days and testimony was provided as well as oral argument. A challenge to a bid specification need not be so formal to satisfy N.J.S.A. 40A:11-13(e). As long as public contracting agencies provide a fair opportunity for challengers to bid specifications to be heard, either before or after the bid awards, the statutory provision is satisfied. The nature of the "hearing" may depend to a large extent on the nature and complexity of the challenge, and the circumstances surrounding the contract, including public necessity. Indeed, it is possible that a challenge processed completely on the papers could suffice. But, at a minimum, each challenger must be accorded an opportunity *694 to present its objections to the specifications and is entitled to an explanation of the contracting agency's decision regarding the challenge.

ENTECH'S BID SPECIFICATION CHALLENGE
The bid opening for contract 08 was scheduled for September 26, 2001, which was a Wednesday. On the Friday before the bid opening, which was September 21, 2001, Entech filed a bid specification challenge concerning the exclusion of shotcrete as a rehabilitation alternative. This challenge meets the three-day requirement for a bid specification challenge contained in N.J.S.A. 40A:11-13(e). CDM acknowledged receipt of the challenge on September 24, 2001 and rejected it without explanation. Entech did not seek to restrain the bid opening, as it could have under Sevell's Auto Body Co., Inc., supra, 306 N.J.Super. at 369-370, 703 A.2d 948.[1] The bid opening thus went forward on September 26, 2001. At that time, Entech submitted a bid proposal including shotcrete as the rehabilitation method. Newark thereafter rejected Entech's bid as non-conforming and awarded the bid to Spiniello, which was determined to be the lowest of the three responsive bidders. Entech apparently did not file a post-opening bid specification challenge with Newark, although it had preserved its right to do so by filing a timely challenge under the Local Public Contracts Law. Rather, Entech filed an Order To Show Cause supported by a Verified Complaint In Lieu of Prerogative Writ in the Superior Court, Law Division, which sought to set aside the bid due to Newark's exclusion of shot crete as a rehabilitation method in contract 08.
In rejecting Entech's challenge without any opportunity for a hearing and without explanation before the bid award, Newark opened itself to a post-award challenge. While this court would prefer that such challenges be brought before the public contracting entity in the first instance so that a record can be made by the governmental body for the court to review, in a manner more procedurally similar to what occurred in Agorganic, supra, 259 N.J.Super. at 383, 613 A.2d 511, the court will not insist on that procedure in this case. First of all, N.J.S.A. 40A:11-13(e) insofar as it relates to bid specification challenges is a relatively new statutory provision that has not been subject to judicial interpretation in a published opinion. There was thus some ambiguity as to the public entity's responsibilities in satisfying the statute when Newark rejected Entech's bid specification challenge. Moreover, Newark has now spread its position on the record before this court through the reports, certifications, and arguments of counsel that have been submitted in this proceeding. Given the public interest in having the sewer rehabilitation project proceed as expeditiously as possible, the court will not insist on an administrative review in this case.
Newark and CDM's refusal to provide reasons to Entech for the exclusion of shotcrete from contract 08 was shortsighted at best, however, because the record shows that Entech's questioning the exclusion of shotcrete was reasonable and merited a substantive response. Had such a response been provided in a timely manner, it is possible that this litigation could *695 have been averted. While neither Newark nor CDM have provided any justification for not responding to Entech's September 21 challenge, the timing of the challenge and the technical complexity of the issues may have contributed to the seemingly automatic and unsupported response provided on Newark's behalf. In any event, based on the current record, the court will proceed to decide the controversy.
After reviewing the two CDM reports and the certification of former CDM project engineer Paul Mourt, it is clear to the court that Newark acted reasonably and well within the discretion accorded it under the Local Public Contracts Law when it excluded shotcrete as a rehabilitation alternative in contract 08 of the brick sewer rehabilitation project. As early as the September 2000 report, CDM anticipated that CIPP liners would be used extensively in the project because of their long design life, resistance to corrosion and abrasion, and because installation was not as operator-dependent as shotcrete application. In fact, CDM recognized CIPP liners as the "benchmark" of sewerliners. Shotcrete's shortcomings were recognized, as noted above, but it was initially considered as a rehabilitation technique for Phase III/IV because of its lower cost for large diameter sewers. Indeed, CDM concluded that shotcrete should be considered if it was found to be the sole cost-effective alternative for the work identified in the particular contract.
After preparation of the September 2000 report, bids were received on the first few contracts for the project that included what CDM determined to be favorable prices for CIPP liners. In the May 2001 CDM report, the engineering firm revisited the use of shotcrete as a rehabilitation technique for the large diameter sewers included in the project and concluded that cost no longer justified use of shotcrete as a rehabilitation method for these sewers. Newark apparently accepted this recommendation, and then began to limit the rehabilitation methods for the project to CIPP and FRP linersboth of which had better hydraulic capacity and a longer design life than shotcrete for the sewer segments proposed for remediation in contract 08. Notably, the federal EPA approved the bid specifications for contract 08 before the bid opening, thus implicitly accepting the exclusion of shotcrete in favor of CIPP or FRP. Mr. Mourt's certification also supported exclusion of shotcrete due to the disadvantages of that method discussed above.
Newark's decision to exclude shotcrete from contract 08 consequently is supported by reasonable technological concerns and is neither arbitrary nor capricious. Moreover, the bid specifications for contract 08 comply with the substantive provisions of N.J.S.A. 40A:11-13 in that they encourage competitive bidding. That this is so is evident from the fact that there were three responsive bidders for contract 08 and Newark selected the lowest of those three bidders, Spiniello. That shotcrete may have been less expensiveeven by somewhat in excess of $ 1 millionis not ultimately persuasive here because there were good technological reasons to exclude shotcrete from the contract. In addition, shotcrete cannot be compared directly to CIPP and FRP in terms of price because gunite is too different from CIPP and FRP in terms of the nature and extent of the rehabilitation provided (i.e., structural versus non-structural; design life; hydraulic capacity; and resistance to corrosion and abrasion) to make direct cost comparison useful. Moreover, the bid specifications reflected sound business and technological judgment and placed all bidders on an equal footing. The overarching principle of the *696 Local Public Contracts Law to foster unfettered competition was consequently achieved.
This conclusion is not undermined by Entech's claim of undue favoritism for CIPP liners based upon the attendance of Newark officials at the ceremonial opening of trading of the stock of Insituform Technologies, Inc. ("ITT") on the NASDAQ stock exchange. ITT is a manufacturer of CIPP sewer liners and apparently holds many patents for this technology. While even counsel for Newark admits "that at first blush this might sound sinister," Newark is correct in also observing that there is nothing in the record in this case to draw any connection between the attendance of Newark officials at the ITT opening and the contract award in this case. First of all, although ITT was a bidder on contract 08, it was not the lowest bidder and the bid was awarded to Spiniello. Moreover, "An unsupported allegation of favoritism to a local bidder does not suffice to establish that an abuse of discretion occurred." Serenity Contracting Group, Inc. v. Borough of Fort Lee, supra, 306 N.J.Super. at 160, 703 A.2d 352. Ultimately, even where statements or suggestions of favoritism such as the claim made here create "suspicion," the "court should be bound by the record." Agorganic, supra, 259 N.J.Super. at 392, 613 A.2d 511. And the record here reveals extensive technological analysis of rehabilitation methods, including shotcrete, reasonable rejection of that technology in favor of alternate methods that were reasonably viewed as likely to achieve superior results, and a bid award that did not go to the bidder who was the alleged object of favoritism. Under these circumstances, Entech's allegation of favoritism remains nothing more than an allegation and is insufficient to invalidate the bid award for contract 08. Entech's claim about the timing of the May 2001 report also is insufficient to require invalidation of the bid award given the strong technological basis for excluding shotcrete and the fact that Newark and CDM may have reasonably decided to exclude shotcrete before the report was finalized, for the reasons ultimately set forth in the formal document. After all, the shortcomings of gunite linings were spelled out in the September 2000 report, which had only reluctantly recommended use of shotcrete where the cost of better lining systems was deemed prohibitive.
In conclusion, therefore, the record supports the exclusion of shotcrete as a rehabilitation alternative for contract 08. Entech's complaint will be dismissed with prejudice and Newark may proceed to award the contract to the lowest responsive bidder.
So ordered.
NOTES
[1] Nothing in N.J.S.A. 40A:11-13(e) suggests that a pre-bid lawsuit in the Superior Court would be precluded by this statutory amendment to the Local Public Contracts Law. The statutory bid specification challenge provision was not addressed in Sevell's Auto Body, supra, 306 N.J.Super. at 357-370, 703 A.2d 948.